MORRISON & FOERSTER LLP
DARALYN J. DURIE (*application for admission to be submitted*)
ddurie@mofo.com
MATTHAEUS MARTINO-WEINHARDT (*application for admission to be submitted*)
mmartinoweinhardt@mofo.com
BETHANY D. BENGFORT (*application for admission to be submitted*)
bbengfort@mofo.com
HANNA M. LAURITZEN (*application for admission to be submitted*)
hlauritzen@mofo.com
425 Market Street
San Francisco, CA  94105
Telephone:     415-268-7000
Facsimile:     415-268-7522

ELLIS LEGAL, P.C.
JOHN C. ELLIS
jellis@ellislegal.com
JUSTIN DELUCA
jdeluca@ellislegal.com
DAVID A. DESCHEPPER
ddeschepper@ellislegal.com
SOPHIA MAIETTA
smaietta@ellislegal.com
200 W. Madison St., Suite 2670
Chicago, IL 60606
Telephone: 312-967-7629

Attorneys for Plaintiffs
J.P., on her own behalf and on behalf of
her minor child, M.A.

IN THE UNITED STATES DISTRICT COURT

FOR THE CENTRAL DISTRICT OF ILLINOIS

|  |  |
|---|---|
| J.P., on her own behalf and on behalf of her minor child, M.A., | **COMPLAINT** |
| Plaintiffs, |  |
| v. | CASE NO. 23-CV-1136 |
| United States of America, |  |
| Defendant. |  |

## I.       INTRODUCTION

1.       This case seeks damages for harms suffered under one of the most shocking and inhumane policies perpetuated by the United States government in recent history:  an unprecedented and systematic directive to forcibly separate children from their asylum-seeking parents at the United States border.  This policy, imposed at the highest levels of the federal government, caused extraordinary trauma to thousands of families, including Plaintiffs, a mother and her ten-year-old son who were forcibly separated for over a year.  The trauma suffered by Plaintiffs was not an accident or unfortunate byproduct of the policy:  it was its entire purpose.  The government *wanted* to inflict emotional distress on parents and children in order to deter them from legally seeking asylum in this country.[1]

2.       Government records demonstrate that the policy was responsible for the forcible separation of at least 5,569 children from their parents or guardians.[2]  Clinical studies have shown that the separations have resulted in psychiatric damage to parents and children equivalent to having been tortured.[3]  And many experienced physical damage as well, suffering physical effects from detention in unsafe and inhumane conditions, without access to adequate food, water, bedding, toilets, or medical care.

3.       The Plaintiffs in this case are two of the thousands of victims that were subject to the inhumane family separation policy.  Fleeing political persecution in Honduras, the mother, J.P., and child, M.A.,[4] presented themselves at a port of entry and requested asylum.  J.P. believed—correctly—that it was legal to seek asylum at a port of entry.  Without cause, government officials accused J.P. of alien smuggling and used her prosecution as a pretext to forcibly separate her from her son.  Government officials transferred M.A. to a shelter hundreds of miles away and deprived J.P. of any information about her son or his whereabouts.  It was not until nearly two months later that J.P. discovered—through her

---

[1] Caitlin Dickerson, *An American Catastrophe*, THE ATLANTIC (Aug. 7, 2022), https://www.theatlantic.com/magazine/archive/2022/09/trump-administration-family-separation-policy-immigration/670604/.

[2] *Id.*

[3] *Part Of My Heart Was Torn Away: What The U.S. Government Owes The Tortured Survivors Of Family Separation,* PHYSICIANS FOR HUMAN RIGHTS (April 2022), https://phr.org/wp-content/uploads/2022/04/PHR_-Report_Deported-Parents_2022.pdf.

[4] Plaintiffs are concurrently filing a motion to proceed under pseudonyms.

sf-5042791

own efforts—where her son had been taken.  J.P. and M.A. were separated *for over a year*, reuniting in February 2019 after months of traumatic isolation and detention.  As a result of this separation, and the appalling conditions of their detention, Plaintiffs suffered severe and lasting emotional and physical distress.

4.      The government's family separation policy was cruel and inhumane, and it was unlawful. The United States is liable for the conduct that harmed Plaintiffs under the Federal Tort Claims Act, 28 U.S.C. §§ 1346(b)(1), 2671, *et seq.* ("FTCA").  Plaintiffs bring this action under the FTCA seeking compensation for the extraordinary harms they suffered at the hands of the federal government.

## II.      JURISDICTION AND VENUE

5.      This Court has jurisdiction over the subject matter of this Complaint under 28 U.S.C. §§ 1331, 1346(b).

6.      On July 24, 2020, J.P. and M.A. submitted administrative claims to the United States Department of Homeland Security ("DHS"), United States Customs and Border Protection ("CBP"), United States Immigration and Customs Enforcement ("ICE"), United States Citizenship and Immigration Services ("USCIS"), the Bureau of Prisons, and HHS.  None of these agencies has made a final disposition of Plaintiffs' administrative claims and, as six months have passed since Plaintiffs' submission of the claims, they are deemed finally denied.  28 U.S.C. § 2675(a).  Accordingly, Plaintiffs have exhausted all potential administrative remedies and may file this action against the federal government. *See id.*

7.      Venue is proper in this District under 28 U.S.C. §§ 1391(e) and 1402(b) because Plaintiffs reside in this District and no real property is involved in this action.  Since they were reunited in February 2019, Plaintiffs have lived together in Bloomington, Illinois.  J.P. regularly meets with a psychologist in Bloomington.  M.A. attends a local public high school.  Plaintiffs intend to remain in Bloomington.

### III.     PARTIES

8.      When federal officials separated M.A. from his mother, M.A. was ten years old.  J.P. and M.A. are currently seeking asylum in the United States.  Plaintiff J.P. brings this action on her own behalf and, independently, on her son's behalf.

9.      J.P. is a class member in *Ms. L v. United States Immigration and Customs Enforcement*, No. 18-cv-0428-DMS-MDD (S.D. Cal.), filed by the American Civil Liberties Union (the "ACLU") in February 2018 on behalf of separated parents to challenge the Family Separation Policy.  On June 26, 2018, the court preliminarily enjoined the Family Separation Policy, holding that the "practice of separating class members from their minor children, and failing to reunify class members with those children, without any showing the parent is unfit or presents a danger to the child is sufficient to find Plaintiffs have a likelihood of success on their due process claim."[5]

10.      Defendant United States of America is the appropriate defendant under the FTCA. 28 U.S.C. §§ 1346(b)(1), 2679(a), *et seq*.

11.      All federal officers referenced in this Complaint were at all relevant times employees of the United States, working within the scope and course of their employment with federal agencies, including, but not limited to, DHS, ICE, CBP, Bureau of Prisons, and HHS.

12.      DHS employees were responsible for separating J.P. from her child.  DHS employees also are responsible for supervising and managing detained individuals at CBP and ICE facilities, including the facilities where Plaintiffs were detained before and at the time of separation, and where J.P was detained during the course of her separation from her child.

13.      HHS employees were responsible for supervising and managing the detention of children that the government classifies as unaccompanied, including at the facilities where M.A. was detained while he was separated from his mother.

14.      Officials from DHS, HHS, and the Department of Justice ("DOJ") worked together to design and promulgate the policy under which children, including M.A., were separated from their parents, including J.P.

---

[5] *Ms. L v. U.S. Immigr. & Customs Enf't*, 310 F. Supp. 3d 1133, 1145 (S.D. Cal. 2018) ("*Ms. L II*").

COMPLAINT / CASE NO.

sf-5042791

15.     At all relevant times, all DHS, ICE, CBP, HHS, Bureau of Prisons, and other officers or employees referenced in this Complaint were acting as investigative or law enforcement officers. 28 U.S.C. § 2680(h).

## IV.    STATEMENT OF FACTS

### A.    The Family Separation Policy

16.     The policy of separating children from their immigrant parents was a deliberate attempt to deter people from seeking asylum in the United States.

17.     In early 2017, Former Chief of the Asylum Division at USCIS held an inter-governmental town-hall meeting where he described a new policy designed to deter asylum-seekers from migrating to the United States with their children.  The centerpiece of this new policy was separating parents from their children upon arrival at the border.[6]  The idea was that the policy would deter parents, who would be terrified of losing their children, from exercising their legal right to seek asylum in the United States.

18.     This new policy was a significant departure from longstanding federal border policy, which prioritized keeping arriving families together.  Prior to the policy's enactment, DOJ had generally declined to "refer parents in family units who were apprehended at the border for illegal entry prosecution if the referral would result in children being separated from their parents."[7]  On March 6, 2017, former DHS

---

[6] Julia Edwards Ainsley, *Exclusive: Trump Administration Considering Separating Women, Children at Mexico Border*, REUTERS (Mar. 3, 2017), https://www.reuters.com/ article/us-usa-immigration-children/exclusive-trump-administration-considering-separating-women-children-at-mexico-border-idUSKBN16A2ES.

[7] *See Review of the Department of Justice's Planning and Implementation of Its Zero Tolerance Policy and Its Coordination with the Departments of Homeland Security and Human Services*, U.S. DEP'T OF JUST. OFF. OF INSPECTOR GEN. 14 (2021) ("DOJ OIG Planning Report"), https://oig.justice.gov/sites/default/files/reports/21-028_0.pdf.  Similarly, DHS had a longstanding policy of keeping arriving immigrant families intact as their immigration cases were handled by immigration officials.  *Id.* at 9 ("At the time, DHS was pursuing such family unit adult cases administratively rather than criminally, consistent with its longstanding policy related to concerns about separating children from parents.").

Secretary John Kelly confirmed that the government was considering family separation as a deterrent to immigration.[8]

19.     On April 11, 2017, former Attorney General Jefferson Beauregard Sessions III issued a memorandum asking federal prosecutors to prioritize criminal enforcement of immigration-related offenses.[9]  Specifically, the April 2017 memo prioritized the enforcement of particular immigration-related offenses, including violations of 8 U.S.C. § 1324 ("[b]ringing in and harboring certain aliens") and 8 U.S.C. § 1325 ("[i]mproper entry by alien").  The Attorney General wrote that prosecution of immigration-related offenses "will further reduce illegality."

20.     In June 2017, ICE terminated the Family Case Management Program, under which asylum seekers were allowed to remain in the community during the pendency of their proceedings while receiving case management services such as legal and social services.  Terminating this program signaled a coordinated policy of subjecting asylum seekers to prolonged detention.

21.     In July 2017, the government launched a family separation pilot program in CBP's El Paso sector.  Under this pilot program, the government began to aggressively prosecute parents who crossed the border with children, detaining the parents and forcibly removing their children.  After the government separated the children from their parents, it designated the children as "unaccompanied minors" and placed the children in the custody of HHS's Office of Refugee Resettlement ("ORR").  The government made no attempt to keep track of the families that had been separated, and as a result, the parents and children who had been separated were unable to communicate or receive information about each other's location or wellbeing.

22.     On December 11, 2017, eight organizations sent a letter to the DHS Office for Civil Rights and Civil Liberties and the DHS Acting Inspector General urging an investigation into DHS's separation of family members in CBP custody at the U.S.-Mexico border and a stop to the "practice of separating

---

[8] *Kelly: Separating Families Under Consideration*, CNN (Mar. 6, 2017), https://www.cnn.com/videos/politics/2017/03/06/trump-travel-ban-separate-parents-children-kelly-tsr-bts.cnn.

[9] Attorney General Jefferson Beauregard Sessions III, Memorandum, *Renewed Commitment to Criminal Immigration Enforcement* (April 11, 2017), https://www.justice.gov/opa/press-release/file/956841/download.

families for purposes of punishment and deterrence."[10]  The letter emphasized "the immense trauma created by the separation of family members and the impact of separation on their ability to pursue legal immigration relief."  The letter also raised concerns about the government's refusal to track or provide contact information for separated family members.

23.     The government, however, continued to push forward.  In December 2017, senior officials at DOJ and DHS exchanged a memorandum titled "Policy Options to Respond to Border Surge of Illegal Immigration."[11]  Two of the policies outlined in the memorandum were titled: "Increased Prosecution of Family Unit Parents" and "Separate Family Units."  Under the proposed prosecution policy, "parents would be prosecuted for illegal entry . . . and the minors present with them would be placed in HHS custody as [unaccompanied alien children]."  The memorandum asserted that "the increase in prosecutions would be reported by the media and it would have substantial deterrent effect."[12]  The separation policy likewise called for an announcement that adults would be placed in adult detention while children would be placed in HHS custody.[13]

24.     Between late 2017 and early 2018, ORR staff in Texas and Arizona noted an increase in the number of children separated from their parents.[14]  DHS officials interviewed by the GAO stated that after the Attorney General's April 2017 memo, there was an increase in the number of noncitizens referred by

---

[10] Letter from Eight Non-Profit Organizations to Cameron Quinn, DHS Officer for Civil Rights and Liberties, and John Kelly, DHS Acting Inspector General, WOMEN'S REFUGEE COMMISSION 2 (Dec. 11, 2017), https://www.womensrefugeecommission.org/wp-content/uploads/2020/04/Family-Separation-Complaint-FINAL-PUBLIC-12-11-17.pdf.

[11] *Policy Options to Respond to Border Surge of Illegal Immigration*, (Dec. 16, 2017), https://www.documentcloud.org/documents/5688664-Merkleydocs2.html ("Policy Options"); *see also* Julia Ainsley, *Trump Admin Weighed Targeting Migrant Families, Speeding Up Deportation of Children*, NBC NEWS (Jan. 17, 2019), https://www.nbcnews.com/politics/immigration/trump-admin-weighed-targeting- migrant-families-speeding-deportation-children-n958811 (explaining that the December 2017 policy options draft plan was made public by the office of Senator Jeff Merkley).

[12] *See id*. at 1.

[13] *Id.*

[14] GAO, *Unaccompanied Children: Agency Efforts to Reunify Children Separated from Parents at the Border*, GAO-19-163, at 13 (Oct. 9, 2018), ("GAO Report") https://www.gao.gov/assets/700/694918.pdf.

CBP to DOJ for prosecution of immigration-related offenses.  Parents who were criminally prosecuted were taken into U.S. Marshals Service custody and separated from their children.

25.     On February 8, 2018, members of Congress sent a letter to DHS Secretary Nielsen expressing their concern that DHS was "intentionally" separating immigrant families along the southern border.[15]  The Congress members wrote that separating families was "unconscionable and contradicts the most basic of American family values."  The Congress members took issue with the purported justification of family separation as a deterrent to migration, stating, "the pretext of deterrence is not a legally sufficient basis for separating families."  The Congress members noted that some reports of instances of family separation "appear[] to be in direct contradiction to previously articulated policies," and that "ICE, [ORR], CBP, and the [DOJ] have inadequate measures to facilitate reunification of separated family members."

26.     On April 6, 2018, President Trump issued a memo entitled "Ending 'Catch and Release' at the Border of the United States and Directing Other Enhancements to Immigration Enforcement."[16]  The memo, among other things, directed the Secretary of Homeland Security, the Secretary of Defense, the Attorney General, and the Secretary of Health and Human Services to submit a report to the President detailing all of the measures their respective departments had pursued or were pursuing to end "'catch and release' practices."[17]  "Catch and Release" is used by critics to refer to a federal practice, implemented before the Trump administration, allowing asylum-seekers, among other groups of immigrants, to live in the community, rather than be held in government custody, while awaiting their immigration hearings.[18] This practice is fully in accord with immigration law.

---

[15] Letter from Lucille Roybal-Allard *et al*, U.S. Congress, to Kirstjen Nielsen, DHS Secretary, IMMIGRATION POLICY TRACKING PROJECT (Feb. 8, 2018), https://immpolicytracking.org/policies/ice-and-cbp-reportedly-separating-family-members/#/tab-policy-documents.

[16] 83 Fed. Reg. 16,179 (Apr. 6, 2018).

[17] *Id.*

[18] Katie Benner & Charlie Savage, *Due Process for Undocumented Immigrants, Explained*, N.Y. TIMES (June 25, 2018), https://www.nytimes.com/2018/06/25/us/politics/due-process-undocumented-immigrants.html.

sf-5042791

27.     Also on April 6, 2018, Attorney General Sessions announced a "Zero Tolerance" policy that extended the El Paso family separation pilot program to the entire southern border.[19]  Under the zero-tolerance policy, which came to be known as the "Family Separation Policy," DOJ mandated the criminal prosecution of all persons who crossed the U.S. border, regardless of whether they were seeking asylum or arriving with children.[20]  "On May 4, 2018, with the urging of Sessions," former DHS Secretary Kirstjen Nielsen signed the DHS policy directing CBP to refer for prosecution adults arriving in family units.[21]  As Sessions explained in a speech on May 7, 2018, "I have put in place a 'zero tolerance' policy for illegal entry on our Southwest border.  If you cross this border unlawfully, then we will prosecute you.  It's that simple."[22]  And if you cross the border with a child, Sessions added, "then we will prosecute you and that child will be separated from you."[23]

28.     The Family Separation Policy's logic was straightforward:  inflict enough harm to discourage migration and deter people from seeking asylum.  Government officials at the highest levels planned and implemented a policy of separating families both knowing that the policy would cause severe harm to the people it affected and specifically intending that it would cause such harm.[24]  For example:

a.     In September 2016, the DHS Advisory Committee on Family Residential Centers issued a report that concluded that "[t]he best interests of the child should be paramount in all custody decisions regarding family members apprehended by DHS," and warned that

---

[19] U.S. Dep't of Just., Off. of Pub. Affs., *Attorney General Announces Zero Tolerance Policy for Criminal Illegal Entry* (Apr. 6, 2018), https://www.justice.gov/opa/pr/attorney-general-announces-zero-tolerance-policy-criminal-illegal-entry.

[20] *DOJ OIG Planning Report*, *supra* note 7, at 1.

[21] *Id.*

[22] *Attorney General Sessions Delivers Remarks Discussing the Immigration Enforcement Actions of the Trump Administration*, U.S. Dep't of Just., Off. of Pub. Affs. (May 7, 2018), https://www.justice.gov/opa/speech/attorney-general-sessions-delivers-remarks-discussing-immigration-enforcement-actions.

[23] *Id.*

[24] Policy Options, *supra* note 11; *see also* Philip Bump, *Here Are the Administration Officials Who Have Said that Family Separation Is Meant as a Deterrent*, Wash. Post (June 19, 2018), https://www.washingtonpost.com/news/politics/wp/2018/06/19/here-are-the-administration-officials-who-have-said-that-family-separation-is-meant-as-a-deterrent/.

"separation of families for purposes of immigration enforcement or management, or detention is never in the best interest of children."[25]

b.  Commander Jonathan White, former Deputy Director of ORR for the Unaccompanied Alien Children's ("UAC") Program, testified before Congress that, starting in February 2017, he repeatedly warned those devising the policy that separating children from their parents would likely harm the children, including "significant potential for traumatic psychological injury to the child."[26]  Administration officials responsible for the policy ignored Commander White's warnings up through the day he left ORR (on March 15, 2018), just weeks before the policy was launched across the entire southern border, and continued to disregard his warnings thereafter.

c.  In March 2017, several DHS officials told the press that the department was considering a policy of separating mothers and children who cross the border illegally in order to deter families from migrating to the United States.[27]  The day after the press report, the American Academy of Pediatrics responded with a statement opposing DHS's proposed family separation program, warning that:

> Federal authorities must exercise caution to ensure that the emotional and physical stress children experience as they seek refuge in the United States is not exacerbated by the additional trauma of being separated from their siblings, parents or other relatives and caregivers.  Proposals to separate children from their families as a tool of law enforcement to deter immigration are harsh and counterproductive.  We urge policymakers to always be mindful that

---

[25] *Report of the DHS Advisory Committee on Family Residential Centers*, U.S. IMMIGR. AND CUSTOMS ENF'T 2, 10 (Sept. 30, 2016), https://www.ice.gov/sites/default/files/documents/Report/2016/ACFRC-sc-16093.pdf.

[26] Jeremy Stahl, *The Trump Administration Was Warned Separation Would Be Horrific for Children, Did It Anyway*, SLATE (July 31, 2018), https://slate.com/newsand-politics/2018/07/the-trump-administration-was-warned-separation-would-behorrific-for-children.html; *see also Examining the Failures of the Trump Administration's Inhumane Family Separation Policy: Hearing Before the Subcomm.on Oversight & Investigations of the H. Comm. on Energy & Commerce*, 116th Cong. (Feb. 7, 2019) (testimony of Commander Jonathan White), https://www.congress.gov/116/meeting/house/108846/documents/HHRG-116-IF02-Transcript-20190207-U1.pdf.

[27] Julia Edwards Ainsley, *Exclusive: Trump Administration Considering Separating Women, Children at Mexico Border,* REUTERS (Mar. 3, 2017), https://www.reuters.com/article/us-usa-immigration-children-idUSKBN16A2ES.

these are vulnerable, scared children.[28]

29.     The government was well aware from the pilot program that separating families would cause significant harm.  When ORR staff noticed a more than tenfold increase in the number of separated children entering its care in the summer of 2017, former Deputy Director of ORR for the Unaccompanied Alien Children's Program elevated concerns to senior ORR, HHS, CBP, and ICE officials about the traumatizing impact the separations would have on children's wellbeing.[29]  Yet responsible officials failed to take steps to minimize the harm that "ORR staff warned was likely and [] ultimately did occur."[30]

30.     Moreover, it is well established that forcibly separating families causes severe harm to children.  Scientific and medical evidence shows that the trauma caused by separating a child from his or her parent is likely to have extraordinarily harmful and long-lasting effects on the child's development.

---

[28] Fernando Stein & Karen Remley, Am. Acad. Of Pediatrics, *AAP Statement Opposing Separation of Mothers and Children at the Border* (Mar. 4, 2017), https://www.aap.org/en/news-room/news-releases/pediatrics2/2017/immigrantmotherschildrenseparationv/.

[29] *See Communication and Management Challenges Impeded HHS's Response to the Zero-Tolerance Policy*, U.S. DEP'T OF HEALTH & HUMAN SERVS., OFF. OF INSPECTOR GEN. 15-16 (2020) ("HHS OIG Communication Report"), https://oig.hhs.gov/oei/reports/oei-BL-18-00510.pdf (reporting that, although ORR staff "[a]t several points before the zero-tolerance policy was implemented" communicated with senior officials "that [ORR] lacked the bed capacity to accommodate a large increase in separated children and were also concerned about the trauma such a policy would inflict on children," there was "no evidence" that officials "took action to protect children's interests in response to the information and concerns raised by ORR staff").

[30] *Id.* at 17.

COMPLAINT / CASE NO.

sf-5042791

Such trauma can cause permanent emotional and behavioral problems and brain damage.[31]  This is especially so where children and parents are separated under false pretenses or in stressful circumstances. Parents waited and watched in terror as children were taken away, fearing that they were next. Immigration officials often separated children in front of their parents, forcing parents to watch as their children were led away—with no idea of where their children were going, how long they would be apart, or whether they would ever be reunited.  Sometimes, "the children were taken away under the pretense that they would be getting a bath."[32]  Other times, officials removed parents to another room and took their children away in their absence, depriving families of any opportunity to say goodbye.[33]

---

[31] *See, e.g.*, Allison Abrams, *Damage of Separating Families: The Psychological Effects on Children*, PSYCH. TODAY (June 22, 2018), https://www.psychologytoday.com/us/blog/nurturing-selfcompassion/201806/damage-separating-families (Children who are separated from a parent "develop insecure/disorganized attachment and persisting high levels of stress."); *id.* ("[T]he effects of mother-child separation on children's aggressive behavior are early and persistent."); Sarah Reinstein, *Family Separations and the Intergenerational Transmission of Trauma*, CLINICAL PSYCHIATRY NEWS (July 9, 2018), https://www.mdedge.com/psychiatry/article/169747/depression/family-separations-and-intergenerational-transmission-trauma ("[C]hildhood trauma is associated with emotional dysregulation, aggression against self and others, difficulties in attention and dissociation, medical problems, and difficulty with navigating adult interpersonal relationships."); Jeremy Raff, *"The Separation Was So Long. My Son Has Changed So Much.": U.S. Border Guards Took a 6-Year-Old Honduran Boy from His Mother, and Ultimately Returned a Deeply Traumatized Child*, The Atlantic (Sept. 7, 2018), https://www.theatlantic.com/politics/archive/2018/09/trump-family-separationchildren-border/569584/ ("The trauma of separation 'can disrupt the architecture of a child's brain[.]' . . . Prolonged separation weaponizes a child's fight-or-flight response, elongating it into toxic stress that can damage health in both the short and long term[.]"); Olga Khazan, *Separating Kids From Their Families Can Permanently Damage Their Brains: A Pediatrician Explains How the Trauma of Family Separation Can Change Biology*, THE ATLANTIC (June 22, 2018), https://www.theatlantic.com/health/archive/2018/06/how-the-stress-of-separationaffects-immigrant-kids-brains/563468/ (Separating a child from his or her parents "can permanently affect . . . children's brains, especially if it occurs early in childhood. . . Studies show that high levels of cortisol, [a stress hormone induced by separation] . . . can suppress the immune system and change the architecture of a developing brain . . .  Another stress chemical, corticotropin-releasing hormone, can damage the hippocampus, which plays a major role in learning and memory.").

[32] Camila Domonoske & Richard Gonzales, *What We Know: Family Separation And 'Zero Tolerance' at the Border*, NPR (June 19, 2018), https://www.npr.org/ 2018/06/19/621065383/what-we-know-family-separation-and-zero-tolerance-at-the-border.

[33] *See, e.g.*, *"Part of My Heart Was Torn Away": What the U.S. Government Owes the Tortured Survivors of Family Separation*, PHYSICIANS FOR HUMAN RIGHTS 16-17 (2022), https://phr.org/wp-content/uploads/2022/04/PHR_-Report_Deported-Parents_2022.pdf.

---

11

sf-5042791

31.     But the harm did not just stop at the separation itself.  Guided by the Family Separation Policy, officers subjected detained families to increasingly inhumane and unsafe conditions, deprived them of adequate food, adequate bedding, and sufficient space to sleep.  Children and adults were packed into metal "cages" where overhead lighting "stay[ed] on around the clock."[34]  Many were initially detained in facilities so cold they were nicknamed "iceboxes."  Despite the frigid temperatures in these facilities, officers often gave migrants only thin aluminum blankets.[35]  Officers often refused to give migrants clean drinking water, forcing migrants to drink foul-smelling and -tasting water from taps next to toilets.  There were inadequate restroom facilities, and many families went days or weeks without access to clean water, showers, soap, or toothpaste.[36]  As one District Judge observed, "the government actors responsible for the 'care and custody' of migrant children have, in fact, become their persecutors."[37]

32.     In May 2018, extensive media reporting concerning the separation policy began to generate public outrage and condemnation.  In the face of this reaction, government officials attempted to change their messaging about the policy; they claimed their hardline stance on prosecuting border crossings was not intended to discourage immigration, and they even denied the existence of a family separation policy at all.[38]

---

[34] Nomaan Merchant, *Hundreds of Children Wait In Border Patrol Facility In Texas*, AP News (June 17, 2018), https://apnews.com/article/north-america-tx-state-wire-us-news-ap-top-news-border-patrols-9794de32d39d4c6f89fbefaea3780769.

[35] Mariana Alfaro, *Migrants Detained at the Border are Kept In Freezing Cells Nicknamed 'Iceboxes' — Here's What We Know about Them*, Bus. Insider (Dec. 27, 2018), https://www.businessinsider.com/migrants-detained-at-border-kept-in-freezing-cells-nicknamed-iceboxes-2018-12; Human Rights Watch, *In the Freezer: Abusive Conditions for Women and Children in US Immigration Holding Cells* (2018), https://www.hrw.org/sites/default/files/report_pdf/uscrd0218_web.pdf.

[36] *See* Human Rights Watch, *supra* note 35, at 16-19.

[37] *Ms. L v. U.S. Immigr. & Customs Enf't*, 302 F. Supp. 3d 1149, 1166 (S.D. Cal. 2018) ("*Ms. L I*").

[38] *See* Christina Wilkie, *White House Denies Separating Families Is "Policy," but Insists It Is Needed "to Protect Children,"* CNBC (Jun. 18, 2018), https://www.cnbc.com/2018/06/18/white-house-denies-separating-families-is-policy.html; *The Way Forward on Border Security: Hearing Before the H. Comm. On Homeland Sec.*, 116th Cong. 46-47, 48 (Mar. 6, 2019) (statement of Sec'y Kristjen Nielsen, Dep't of Homeland Sec.).

sf-5042791

33.    These statements, however, were contradicted by the admissions of numerous high-level officials that family separation was the express policy and that the purpose of the policy was to harm asylum seekers arriving in the United States so as to deter future asylum seekers.  For instance:

    a.    On May 11, 2018, John Kelly, then the President's Chief of Staff, said of the Family Separation Policy that "a big name of the game is deterrence. . . . It could be a tough deterrent — would be a tough deterrent."[39]  As for the children affected, he said:  "[t]he children will be taken care of — put into foster care or whatever."[40]

    b.    On June 18, 2018, when asked whether deterrence was the purpose of family separation, Attorney General Sessions replied, "I see that the fact that no one was being prosecuted for this as a factor in a five-fold increase in four years in this kind of illegal immigration.  So yes, hopefully people will get the message and come through the border at the port of entry and not break across the border unlawfully."[41]

    c.    On June 19, 2018, Steven Wagner, Assistant Secretary of HHS, told reporters that "[w]e expect that the new policy will result in a deterrence effect, we certainly hope that parents stop bringing their kids on this dangerous journey and entering the country illegally."[42]

34.    Accordingly, senior government officials made the express choice to intentionally cause parents and children, including very small children, extraordinary pain and suffering in order to accomplish their policy objectives.

35.    The government's policy of separating children was a mandatory policy that, as implemented, required CBP and ICE agents to separate parents from their children after crossing the

---

[39] *Transcript: White House Chief of Staff John Kelly's Interview with NPR*, NPR (May 11, 2018), https://www.npr.org/2018/05/11/610116389/transcript-white-house-chiefof-staff-john-kellys-interview-with-npr.

[40] *Id.*

[41] *The Ingraham Angle: Sessions Defends Zero Tolerance Immigration Policy,* FOX NEWS CHANNEL (Fox News television broadcast Jun. 18, 2018), https://video.foxnews.com/v/5799065216001/#sp=show-clips.

[42] Bump, *supra* note 24.

sf-5042791

border, even if there was no evidence of criminal activity—the government's pretext for separation and deterrence.

36.     In addition, as emphasized by the Honorable Dana M. Sabraw of the Southern District of California in a ruling addressing the constitutionality of the family separation policy in *Ms. L*, the agencies' failure to coordinate tracking of separated families was a "startling reality" given that:

> The government readily keeps track of personal property of detainees in criminal and immigration proceedings.  Money, important documents, and automobiles, to name a few, are routinely catalogued, stored, tracked and produced upon a detainee's release, at all levels—state and federal, citizen and alien.  Yet, the government has no system in place to keep track of, provide effective communication with, and promptly produce alien children.  The unfortunate reality is that under the present system migrant children are not accounted for with the same efficiency and accuracy as ***property***.  Certainly, that cannot satisfy the requirements of due process.[43]

37.     The government compounded the harm it caused by failing to provide parents and children, including Plaintiffs, with any information regarding each other's whereabouts or well-being for weeks and, in many cases, months, and by failing to facilitate adequate communication between parents and children.[44]  The torture of not knowing where their family members were, whether they were healthy and

---

[43] *Ms. L II*, 310 F. Supp. 3d at 1144 (emphasis in original).

[44] *See, e.g.*, *id.* at 1136-37 ("[T]here is no genuine dispute that the Government was not prepared to accommodate the mass influx of separated children.  Measures were not in place to provide for communication between governmental agencies responsible for detaining parents and those responsible for housing children, or to provide for ready communication between separated parents and children."); Kevin Sieff, *The Chaotic Effort to Reunite Immigrant Parents with Their Separated Kids*, WASH. POST, (June 21, 2018), https://www.washingtonpost.com/world/the_americas/the-chaotic-effort-to-reunite-immigrant-parents-with-their-separated-kids/2018/06/21/325cceb2-7563-11e8-bda1-18e53a448a14_story.html (reporting that "government authorities have often been unwilling to arrange phone calls between [separated parents and children], or provide details about where the child is held").

safe, and when or whether they would see each other again further exacerbated the trauma parents and

children suffered as a result of being torn apart.[45]

38.     Only after the family separation policy garnered widespread condemnation did President

Trump, on June 20, 2018, sign an executive order ("EO") purporting to end it.  The EO, however, did not

explain whether or how the federal government would reunify children whom the government had

forcibly separated from their parents.  In fact, on June 22, 2018, the government admitted that it had no

reunification procedure in place.[46]

39.     On June 26, 2018, in *Ms. L II*, Judge Sabraw ordered the government to reunify families.

The class-wide preliminary injunction, among other things, prohibited the government from separating

parents from their minor children in the future, absent a determination that the parent is unfit or presents a

danger to the child; prohibited the deportation of any detained parent before reunification with his or her

---

[45] *See, e.g.*, *Care Provider Facilities Described Challenges Addressing Mental Health Needs of Children in HHS Custody*, U.S. Dep't of Health & Human Servs., Off. of Inspector Gen. 11 (Sept. 2019), https://oig.hhs.gov/oei/reports/oei-09-18-00431.pdf ("Adding to the challenge of addressing the mental health needs of separated children was the uncertainty that came with a hectic reunification process for children covered by the *Ms. L v. ICE* lawsuit. . .  Changing guidance resulted in uncertainty around how or when reunification would happen.  For example, case managers in facilities were not always able to let children know when, or even if, they would be reunified with their parents, or whether that reunification would happen in the United States.  This type of uncertainty added to the distress and mental health needs of separated children. . .  [F]acilities reported that logistical issues introduced further uncertainty that could lead to emotional distress.  Facilities reported that some reunifications were scheduled with little advance notice, or suddenly canceled or delayed, which increased the levels of uncertainty and anxiety in separated children . . .").

[46] *See Ms. L II*, 310 F. Supp. 3d at 1140–41 (citing June 22, 2018, Status Conference Tr. at 29-30, *Ms. L*, No. 18-cv-00428 DMS MDD (S.D. Cal.), ECF No. 77); *see also* GAO Report at 21 ("HHS officials told [the GAO] that there were no specific procedures to reunite children with parents from whom they were separated at the border prior to the June 2018 court order.").  The only procedure in place capable of reuniting children with their parents was the procedure developed to place unaccompanied children with sponsors in compliance with the Trafficking Victims Protection Reauthorization Act.  *Id*. at 5-6.  Under this procedure, however, a parent could only be reunited with his or her child if the government deemed them eligible to be a sponsor.  *Id*.  Judge Sabraw noted that this procedure was inadequate because it was created to address "a different situation, namely what to do with alien children who were apprehended *without their parents* at the border or otherwise," and further, that the procedure was not developed to address situations such as this one where family units were separated by government officials after they crossed the border together.  *Id*. at 27 (quoting July 10, 2018, Order at 2, *Ms. L*, No. 18-cv-00428 DMS MDD (S.D. Cal. July 10, 2018), ECF No. 101).

separated children; and ordered the government to reunify parents separated from children under the age of five within fourteen days, and with children aged five and older within thirty days.[47]

40.     Judge Sabraw criticized the agencies for their callous treatment of families: "[W]hat was lost in the process was the family.  The parents didn't know where the children were, and the children didn't know where the parents were.  And the government didn't know, either."[48]

41.     Consistent with Judge Sabraw's rulings, the government's policy of separating children from their parents in the absence of a determination that the parents were unfit or presented a danger to their children and its failure to track the children and promptly reunite the families once they were separated violated the constitutional right to family integrity of the persons subject to the policy, including Plaintiffs.[49]

42.     As evidenced by high-level officials' statements that the policy's purpose was to deter asylum seekers, the government's refusal to provide parents and children any information about each other's whereabouts and well-being, and its failure to track separated families and address reunification in any meaningful way until a federal judge ordered it to do so, the government instituted and implemented this policy to intentionally inflict emotional distress on the parents and children whom it separated.  It succeeded, with devastating consequences for Plaintiffs.

---

[47] *Ms. L II*, 310 F. Supp. 3d at 1149-50.

[48] July 27, 2018, Status Conference Tr. at 58, *Ms. L*, No. 18-cv-00428 DMS MDD (S.D. Cal.), ECF No. 164.

[49] *See Ms. L I*, 302 F. Supp. 3d at 1161-67 (finding that plaintiffs had stated a legally cognizable claim for violations of their substantive due process rights under the Fifth Amendment to the U.S. Constitution based on their allegations that the government had separated them from their minor children, and kept them separated from their minor children, while they were held in immigration detention and without a showing that they were unfit parents or otherwise presented a danger to their children); *Ms. L II*, 310 F. Supp. 3d at 1142-46 (finding that plaintiffs were likely to succeed on the merits of their substantive due process claim); see also *Smith v. Org. of Foster Families for Equal. & Reform*, 431 U.S. 816, 845 (1977) (liberty interest in family relationships has its source in "intrinsic human rights").

COMPLAINT / CASE NO.

sf-5042791

**B.    Defendant Forcibly Separated J.P. and M.A.**

**1.    J.P. and M.A. fled death threats in Honduras and DHS officials forcibly separated them in the United States**

43.    J.P. fled Honduras in December 2017 with her then-ten-year-old son, M.A.  In Honduras, J.P. was an active and outspoken member of a political party.  In approximately November 2017, members of the Mara Salvatrucha ("MS") gang began threatening J.P. because of her political party.  The threats escalated.  In December 2017, after her party won the election, gang members threatened to burn J.P.'s home and kill J.P.  This final, grave threat caused J.P. to flee Honduras with M.A.

44.    On or around January 13, 2018, J.P. and M.A. arrived at the pedestrian bridge at the Paso del Norte Port of Entry along the U.S.-Mexico border.  J.P. and M.A. got in line with other people waiting to enter the United States.

45.    J.P. wanted to apply for asylum at a port of entry.  J.P. wanted to do so because she wanted to follow the law, which she understood to permit asylum-seekers like herself to apply for asylum at the border.

46.    J.P. and M.A. approached the checkpoint.  J.P. told the CBP officer at the checkpoint that she and her son did not have documents to enter the United States.  J.P. told the officer that she and her son wanted to apply for political asylum.  J.P. presented the officer with her Honduran identity card and M.A.'s birth certificate naming J.P. as his mother.  The officer referred J.P. and M.A. to secondary inspection.

47.    In secondary inspection, one of the CBP officers asked M.A. if J.P. was his mother.  M.A. said yes.  The officer replied "no, she is not your mom."  This comment was confusing and distressing to J.P. and M.A.

48.    Without warning or cause, the CBP officers became very aggressive with J.P., yelling at her and accusing her of being a "coyote," or a smuggler.  The CBP officers yelled repeatedly that M.A. was not her son.  CBP officials arrested J.P. and referred her for prosecution of alien smuggling, 8 U.S.C. § 1324, a felony.

49.     J.P. did not understand why the CBP officers accused her of smuggling.  She presented herself at the point of entry with her son.[50]  She truthfully told the officer that she and her son did not have documents to enter the United States.  She asked that she and her son be permitted to apply for asylum.  She presented proof that she was M.A.'s mother.  J.P. did not understand what she had done wrong.

50.     Around 4 p.m., CBP officials took J.P. and M.A. to a small hold room with a couple mats on the floor.  Another woman was already detained in the room.  The officials took away J.P.'s personal belongings, including her wallet, clothes for her child, documents, and toiletries.  Several times, CBP officials took M.A. outside of the room to interview him.  Each time he came back sobbing and was inconsolable.  At the time, M.A. was in treatment for a heart murmur, and the conduct by CBP officials caused J.P. extreme worry for his health.

51.     The hold room was cold.  Other than the mat, CBP officials did not provide J.P. and M.A. with any bedding.  With only a thin mat separating J.P. and M.A. from the floor, and without a blanket or anything that might keep them warm, J.P. and M.A. were subjected to intolerably cold conditions.

52.     CBP officials detained J.P. and M.A. in the small room until around 10 a.m. the next day.  The CBP officials did not provide J.P. or M.A. with food or water at any point and only permitted them to leave the room once to use the restroom.  Neither J.P. nor M.A. were allowed to bathe or brush their teeth.  The CBP officials likewise failed to return J.P.'s personal belongings to her.

53.     By subjecting M.A. to inhumane and unsafe conditions in CBP detention, Defendant violated federal law and policy requiring that minors who are detained by CBP or other DHS agencies be held in "facilities that are safe and sanitary," and that account "for the particular vulnerability of minors."[51]  Defendant violated requirements that minors detained by CBP be provided access to toilets, sinks, adequate temperature control and ventilation, drinking water, and food.

---

[50] J.P. was not accompanied by family members or relatives other than her son and did not tell CBP officers that she was accompanied by anyone other than M.A., despite CBP records to the contrary.

[51] FSA ¶ 12.A, https://www.clearinghouse.net/chDocs/public/IM-CA-0002-0005.pdf; *see also Memorandum from David V. Aguilar, Chief, U.S. Border Patrol, to All Chief Patrol Agents*, U.S. CUSTOMS & BORDER PROT. (Jun. 2, 2008), https://nomoredeaths.org/wp-content/uploads/2014/10/Hold-Rooms-Short-Term-Custody-Policy.pdf ("Short-Term Custody Policy"); *Flores v. Barr*, 934 F.3d 910, 915–916 (9th Cir. 2019).

54.     At around 10 a.m. on or around January 14th, CBP officials told J.P. to say goodbye to her child.  One CBP officer told her that she would see M.A. "maybe in fifteen years, if at all."  Despite her panicked questions, the officers gave J.P. no further information on why she was being separated from her child or where her child was going.

55.     The CBP officers then forcibly removed M.A. from his mother, despite J.P. and M.A.'s protests and extreme distress.

### 2.     DHS officials transferred M.A. hundreds of miles from his mother, to a shelter in Arizona

56.     After removing M.A. from his mother, government officials took him to a shelter for unaccompanied minors in Arizona operated through a contract with the Office of Refugee Resettlement.

57.     M.A. was miserable at the shelter and cried constantly for his mother.  When M.A. asked an official at the shelter when he would see his mother, the official replied, "never."

58.     While he was at the shelter, M.A. was bullied by other children.  In one altercation, a child stabbed him with a pencil and split his lip open.

59.     M.A. was at the shelter for about two months.  He was released on or about March 11, 2018 to another relative who lived in the United States.

60.     For nearly the entire time M.A. was at the shelter, J.P. did not know where her son was.  It was not until M.A.'s final two weeks at the shelter that he was finally able to speak with his mother by phone.  Defendant violated federal law and policy requiring children held in ORR custody be provided with "contact with family members."[52]

### 3.     J.P.'s illegal detention

61.     While M.A. was transported to Arizona, J.P. was sent to the El Paso County Detention Facility, a nearby jail.  Upon arrival at the jail, the guards stripped J.P. naked and searched her for contraband, in full view of many others.  The guards placed her in a cafeteria-like room where she stayed

---

[52] *Flores v. Lynch*, 828 F.3d 898, 903 (9th Cir. 2016) (citing *Flores v. Reno*, FSA, No. 85-CV-4544 (C.D. Cal. Jan. 17, 1997), at ¶ 21); *see also ORR Unaccompanied Children Program Policy Guide: Section 3*, OFFICE OF REFUGEE RESETTLEMENT § 3.3.10 (Apr. 20, 2015), https://www.acf.hhs.gov/orr/policy-guidance/unaccompanied-children-program-policy-guide-section-3#3.3.10.

sf-5042791

for several days, packed in like sardines with dozens of other women.  J.P. was not given bedding and was forced to sleep on the bare floor.

62.     J.P. was given food for the first time at 3 p.m. on January 14th, approximately 24 hours after her detention.  The food she was given consisted only of an apple and a juice box.  J.P. was not given food again until approximately 3 a.m. the next day, when she was so weak with hunger and exhaustion that she nearly fainted.

63.     During her stay at the jail, a guard taunted J.P., telling her she was a liar and that she was never going to see her child again.  She eventually grew so upset that another guard sent her to see a therapist.  During her appointment with the therapist, J.P. had trouble breathing, showing symptoms of an anxiety attack.  The therapist helped her with breathing exercises and offered her medication to ease her anxiety.  The therapist told her that if she didn't calm down, he would put her on suicide watch, meaning that the guards would pay extra attention to her.  J.P. continued having anxiety and saw the therapist multiple times.

64.     While she was in criminal custody, J.P. could not get any information about her son's whereabouts from government officials.

65.     On February 23, 2018, J.P.'s criminal indictment was dismissed upon the prosecution's request.

### 4.     J.P. is transferred to immigration custody, where Defendant's employees mistreat her and coerce her into abandoning her asylum claim

66.     On February 23, 2018, government officials transferred J.P. to civil immigration custody. The officials took J.P. to a high-security detention facility named El Corralón, which was likely the El Paso Processing Center located at 8915 Montana Avenue, El Paso, Texas, 79925, but may have been the Port Isabel Detention Center located at 27991 Buena Vista Blvd, Los Fresnos, TX 78566.  The barracks housed two types of immigrant detainees:  ordinary detainees, who wore "blue" jumpsuits, and detainees who had committed aggravated felonies, who wore "orange" or "red" jumpsuits.  Even though J.P. had never been convicted of a crime, she was given an orange jumpsuit.

sf-5042791

67.     Of the thirty women wearing orange jumpsuits in J.P.'s barracks, she was the only one who had been detained entering the United States.  The rest of the women were awaiting deportation because they had been convicted of selling drugs, stealing, assault, or other felonies while in the United States.  The women got into vicious fights, and J.P. was afraid of them.  Because she was wearing an orange jumpsuit, and because the guards treated her like a criminal, the other detainees were afraid of her, too.  J.P. had constant anxiety and fell into a deep depression.

68.     As soon as J.P. arrived at the detention facility, she began asking the officials where her son was.  J.P. wrote several letters asking to speak with the officer in charge of the facility so that she could ask for information about her son.  Despite her pleas, government officials never told J.P. where her son was.  Instead, a friend of hers who lived in Chicago figured out M.A.'s location and told J.P.

69.     Officials at the detention facility allowed J.P. one three-minute phone call with her son per week during his final two weeks at the shelter in Arizona.  During one of these calls, M.A. told J.P. that immigration officials had taken him on a long plane ride after separating him from his mother.  This was the first time that J.P. understood how far her son was from her.  This revelation devastated J.P.

70.     Documents produced by ICE and USCIS in response to FOIA requests show that, on various occasions while in immigration detention, J.P. attempted to obtain her son's contact information and otherwise expressed her concern for her son.  An entry in the ICE TECS System shows that on an unknown date prior to March 9, 2018, "Asylum Received staff detainee letter requesting the address for the center in AZ where her child is being housed.  Advised subject that we cannot provide her with that information [and] to contact the center and ask them for the address."  On March 2, 2018, J.P. provided a sworn statement to Martin Sarellano, Jr., her deportation officer, in connection with her application for admission to the United States.[53]  At the end of the interview, the deportation officer asked J.P. whether there was anything else she wanted to say.  J.P. is recorded as stating, "I am worried about . . . my son who was separated from me."

---

[53] J.P.'s Record of Sworn Statement in Proceedings under Section 235(b)(1) of the Immigration and Nationality Act on Form I-867A was produced in response to a FOIA request.

COMPLAINT / CASE NO.
sf-5042791

71.     On or about March 4, 2018, J.P. met with her Deportation Officer.  The Deportation Officer asked J.P.'s forgiveness, explaining that the criminal charges were a mistake and that she should not have been placed in the barracks with the women with a criminal history.  The Deportation Officer told J.P. that she could collect documents to request that she be released from detention.

72.     On March 9, 2018, J.P. completed her credible fear interview with an asylum officer.  The Asylum Officer determined that J.P. stated a credible fear of returning to Honduras.

73.     By March 9, 2018, J.P. had completed and submitted her documents.  J.P. explained that the charges were a mistake and that she had been separated from her son, who had a heart condition.

74.     By March 13, 2018, J.P.'s application to be released from detention was rejected.  The reason given was that she was dangerous and a threat to the United States.

75.     On or around April 3, 2018, J.P. attended a hearing before the immigration judge.  The judge told J.P. that her lack of legal representation would make all attempts at securing asylum pointless.  The judge also told her that she must fill out all of the papers in English.

76.     On May 9, 2018, J.P. attended a second court hearing.  Depressed and despondent at her chances of release, and unable to fill them out in English, J.P. did not bring her documents.  The judge again told J.P. that, because she was not represented by a lawyer, it would be at least a year before she would be released, and she would not win her case.  The judge told her that, if she wanted to be released from detention sooner, she could consent to deportation.  Desperate to leave the barracks and fearing for her safety if she remained, and feeling based on the judge's comments that she had no other choice, J.P. agreed.

77.     J.P. continued to ask government officials to help her reunite with her son.  A case comment in J.P.'s Enforce Alien Removal Module ("EARM") entered on May 17, 2018 states: "Forwarded request to be repatriated with son to JUVENILE."  J.P.'s pleas went unanswered.

78.     While detained, in an effort to obtain money for the charges the facility imposed to make a telephone call, J.P. cleaned the detention facility for a couple of dollars per week, which enabled her to call her son for a few minutes.  Toward the end of May 2018, J.P. severely injured her spine while lifting a bucket of water.  Barely able to move, guards forced her to walk herself to the doctor's office.  The doctor

gave J.P. a heat pack and a low-grade pain medication without any further follow-up or help.  Despite her severe pain, the guards forced J.P. to walk to get food and complete all work and routine activities.  If J.P. refused, she would not have received money to pay the facility to be able to call her son.

79.     Still in severe pain, government officials deported J.P. from the United States on or around June 6, 2018.

80.     At the airport in Honduras, doctors and social workers met J.P. and the other deportees who arrived with her.  J.P. received medical attention for the injury to her spine.  J.P. met a therapist who attended to J.P. approximately once per week.

81.     J.P. fell into a deep depression.  J.P. was devastated that she was so far away from her son and terrified that MS gang members would find out she had returned and kill her.  Out of depression and fear, J.P. stayed inside nearly the whole time she was in Honduras.  J.P. became so depressed that she contemplated suicide.

**C.     J.P. and M.A.'s Reunification**

82.     J.P. was desperate to reunite with her son.  She contacted a lawyer whose phone number someone had given her in immigration detention.  The lawyer told J.P. that because she was in Honduras, she was ineligible for reunification.  Thinking it was the only way to reunite with her son, J.P. left Honduras for the United States.  J.P. journeyed across the border on foot, crossing a river and other dangers.  J.P. crossed the border on February 7, 2019.

83.     Once she crossed the border, J.P. presented herself to a CBP official.  An official looked up J.P.'s information in a computer.  The official then began laughing with another official and making fun of J.P.  She was again detained for several days with extremely little food and water and nothing to sleep on.

84.     A few days later, government officials took J.P. to a tent with other detainees.  An official put an ankle bracelet on J.P.  As he was doing so, he told J.P. she was lucky because the government was allowing her to leave, "even though we shouldn't."  J.P. was paroled into the United States on February 11, 2019.

85.     Government officials put J.P. and the other detainees on a bus that took them to a church.  People at the church treated J.P. well—they fed her and gave her a bed to sleep in.  It was the first time

J.P. had slept on something other than the floor since she arrived in the United States.  The church provided J.P. with access to a phone.  J.P. called her friend in Illinois, who bought J.P. a bus ticket to Illinois.

86.    After several days on the bus with nothing to eat or drink, and over one year of separation, J.P. and M.A. reunited on approximately February 16, 2019.  When J.P. saw her son, she felt like she regained a part of herself that had been missing.  The reunion was painful as well as joyful as J.P. knew she could not remedy the four hundred days of pain and suffering they both experienced while they were separated.

87.    J.P. and M.A. have applied for asylum based on their fear that if they return to Honduras, the gang will kill J.P. because of her political opinion.  They reside in the United States lawfully on the basis of their pending asylum applications.

### D. The Government's Mistreatment of Plaintiffs Violated Mandatory Obligations Under Federal Law

88.    The government's separation of Plaintiffs and the way it was effectuated violated binding obligations under the United States Constitution, court orders, and agency standards.

#### 1. Defendant's separation and treatment of J.P. and M.A. violated the Constitution

89.    The Due Process Clause of the Fifth Amendment protects the right to family integrity and applies to all people present in the United States.[54]  "The fact that [families are] lawfully detained in immigration custody does not eliminate [their] due process right to family integrity."[55]

90.    At the heart of this constitutional guarantee is the right of children and their parents to remain together.[56]  According to the Supreme Court, "[i]t is cardinal with us that the custody, care and

---

[54] *Zadvydas v. Davis*, 533 U.S. 678, 693 (2001); *Landon v. Plasencia*, 459 U.S. 21, 32 (1982); *Plyler v. Doe*, 457 U.S. 202, 210 (1982); *Mathews v. Diaz*, 426 U.S. 67, 77 (1976); *Kwong Hai Chew v. Colding*, 344 U.S. 590, 596-98, & n.5 (1953); *Yick Wo v. Hopkins*, 118 U.S. 356, 369 (1886).

[55] *Jacinto-Castanon de Nolasco v. U.S. Immigr. & Customs Enf't*, 319 F. Supp. 3d 491, 500 (D.D.C. 2018).

[56] *See, e.g., Quilloin v. Walcott*, 434 U.S. 246, 255 (1978); *Wisconsin v. Yoder*, 406 U.S. 205, 231-33 (1972); *Meyer v. Nebraska*, 262 U.S. 390, 399-401 (1923).

COMPLAINT / CASE NO.
sf-5042791

nurture of the child reside first in the parents, whose primary function and freedom include preparation for obligations the state can neither supply nor hinder."[57]

91.    J.P. and M.A. had a constitutional right to remain together as a family.  The initial and continued separation, and the way the separation was effectuated, violated the Due Process Clause of the Fifth Amendment.

92.    The government had no legitimate, let alone compelling, reason to separate J.P. and M.A. On information and belief, the government manufactured an alien smuggling charge for the purpose of taking M.A. away from his mother.

93.    Once J.P.'s alien smuggling charge was dismissed and she was transferred to immigration detention, the government had no legitimate, let alone compelling, reason to continue to separate J.P. and M.A.[58]  Instead of subjecting Plaintiffs to continued separation, government officials could have reunited mother and son in a family immigration detention center or promptly given J.P. a credible fear interview and released her on bond.[59]

94.    The government's actions, including separating J.P. and M.A. and impeding their ability to communicate while separated, shock the conscience and demonstrate more than deliberate indifference toward and reckless disregard for Plaintiffs' right to family integrity.

95.    The Due Process Clause of the Fifth Amendment also protects the right of every person in the United States to a fair hearing in connection with the deprivation of life, liberty, or property.

96.    The government violated Plaintiffs' procedural due process rights by forcibly separating them without notice or an opportunity to be heard.

97.    The denial of notice and an opportunity to be heard was not supported by a legitimate or compelling government interest.

---

[57] *Prince v. Massachusetts*, 321 U.S. 158, 166 (1944); *see also Smith*, 431 U.S. at 845 (explaining that the liberty interest in family unification stems from "intrinsic human rights").

[58] *See* March 23, 2023, Order, *D.A. v. United States*, No. 3:22-cv-00295-FM (W.D. Tex.), ECF No. 126 at 18-19 (holding, in a similar family-separation FTCA case, that the continued separation following a parent's release from criminal custody plausibly violated plaintiffs' due process rights to family integrity).

[59] *See id.* at 19 (describing these alternatives).

98.     The Fifth Amendment guarantee of equal protection protects the right to be free from government action that is motivated by a racially discriminatory intent or purpose.  Even facially neutral policies and practices are unconstitutional when they reflect a pattern unexplainable on grounds other than race or national origin, or other indicia of discriminatory intent.[60]

99.     The constitutional right to equal protection under the law, and to freedom from invidious discrimination by the government on the basis of race or national origin, have long been recognized as "extend[ing] to anyone, citizen or stranger, who is subject to the laws of a State."[61]

100.    The separation and treatment of J.P. and M.A. violated their constitutional right to equal protection because the government's actions were motivated by discriminatory animus toward Central American migrants.

101.    The government targeted Central American migrants, like Plaintiffs, for separation and harsh treatment as a means to deter others like them from pursuing legitimate asylum claims and from seeking humanitarian protection in the United States.

102.    Defendant's Family Separation Policy disproportionately affected people from Central America—more than ninety-five percent of the members in the *Ms. L* certified class are from Central American countries.[62]

103.    The constitutional violations involved in separating parents and children without justification were obvious and palpable given the long history of constitutional protection for family integrity and the equally long constitutional condemnation of government policies and actions motivated by ethnic and racial animus.

---

[60] *See Vill. of Arlington Heights v. Metro. Hous. Dev. Corp.*, 429 U.S. 252, 266 (1977) ("Sometimes a clear pattern, unexplainable on grounds other than race, emerges from the effect of the state action even when the governing legislation appears neutral on its face."); *Rogers v. Lodge*, 458 U.S. 613, 622 (1982) (holding that facially neutral policy maintaining a county-wide at-large electoral system violated the Equal Protection Clause because it was "being maintained for the invidious purpose of diluting the voting strength of the black population").

[61] *Plyler*, 457 U.S. at 215.

[62] *Family Separation by the Numbers,* ACLU (Oct. 2, 2018) (reporting that of the then-known separated children between the ages of five and seventeen, ninety-six percent were from El Salvador, Guatemala, and Honduras), https://www.aclu.org/issues/family-separation.

sf-5042791

104.    Defendant had no discretion to violate the Fifth Amendment to the U.S. Constitution.

### 2.    Defendant's separation and treatment of J.P. and M.A. violated the *Flores* Consent Decree (the "*Flores* Agreement" or the "FSA")

105.    The *Flores* Agreement is a class-action consent decree entered in 1997 between the government and "[a]ll minors who are detained in the legal custody of the [government's immigration agencies],"[63] including those, like M.A., who arrived in the United States with their parents to seek protection.[64]  The FSA sets national standards for the detention, release, and treatment of immigrant children in the government's custody, and its mandates are binding on the government's "agents, employees, contractors and/or successors in office."[65]  DHS, CBP, ICE, HHS, and ORR, as successor organizations to the Immigration and Naturalization Service ("INS"), must comply with the FSA's requirements.[66]

106.    The *Flores* Agreement meaningfully limits the circumstances, duration, and manner of immigration detention of minor children.

107.    The FSA "creates a presumption in favor of release and favors family reunification."[67]  The government intentionally designed the Family Separation Policy to circumvent its obligation under the

---

[63] FSA ¶ 10.

[64] *Flores v. Lynch*, 828 F.3d 898, 907-08 (9th Cir. 2016) (holding that *Flores* Agreement "unambiguously applies to accompanied minors"); *see also Bunikyte, ex rel. Bunikiene* v. *Chertoff*, Noa. A-07-CA-164-SS, 2007 WL 1074070, at *3 (W.D. Tex. Apr. 9, 2007) ("[T]he *Flores* Settlement, by its terms, applies to all 'minors in the custody' of ICE and DHS, not just unaccompanied minors.").

[65] FSA ¶¶ 1, 9; *see also E.O.H.C. v. Sec'y U. S. Dep't of Homeland Sec.*, 950 F.3d 177, 192 (3d Cir. 2020) (noting that as "the District Judge overseeing the *Flores* Settlement Agreement in the Central District of California has repeatedly recognized, the settlement is a 'binding contract'" (quoting *Flores v. Barr*, 407 F. Supp. 3d 909, 931 (C.D. Cal. 2019)); *Bunikyte*, 2007 WL 1074070, at *8 ("The [*Flores*] Settlement Agreement is, in essence, a Court-approved contract binding on ICE and DHS.").

[66] *Flores v. Rosen*, 984 F.3d 720, 727 n.1 (9th Cir. 2020) ("Although the [*Flores*] Agreement refers to 'INS,' the Immigration and Naturalization Service's obligations under the Agreement now apply to the Department of Homeland Security ('DHS') and the Department of Health and Human Services ('HHS')"); *Flores v. Sessions*, 862 F.3d 863, 869 (9th Cir. 2017) ("[T]he [*Flores*] Settlement continues to govern those agencies that now carry out the functions of the former INS."); *Ruiz ex rel. E.R. v. United States*, No. 13-1241, 2014 WL 4662241, at *7 (E.D.N.Y. Sept. 18, 2014) (applying the *Flores* Agreement to CBP).

[67] *Flores v. Lynch*, 828 F.3d at 903.

FSA to maintain family unity.  Pursuing a policy of deterrence by way of separating parents and children undermines an overriding purpose of the FSA, which is to maintain family integrity.

108.    The FSA obligates immigration agencies to treat minors "with dignity, respect and special concern for their particular vulnerability as minors."[68]  Defendant violated this obligation when its employees committed gratuitous acts of cruelty against M.A., including when CBP officials yelled that J.P. was not M.A.'s mother and when a shelter employee told M.A. that he would "never" see his mother again.

109.    The FSA requires the relevant agencies to hold minor children in conditions that are "safe and sanitary" and that recognize "the particular vulnerability of minors."[69]  In addition, facilities where immigrant children are detained "will provide access to toilets and sinks, . . . adequate temperature control and ventilation, . . . and contact with family members who were arrested with the minor," among other things.[70]  By failing to provide adequate temperature control and sanitation in the hold room where M.A. was held, CBP violated this provision.  ICE and ORR violated the same provision by failing to facilitate adequate communication between M.A. and J.P. after their separation.

110.    The government implemented the family separation policy without complying with the requirement that it "make and record the prompt and continuous efforts . . . toward family reunification[.]"[71]  The government's failure to record, or to record accurately or timely, M.A.'s location and transfers, frustrated and delayed Plaintiffs' ability to communicate with each other.  On information and belief, the government made no attempt to reunify J.P. and M.A.  It was only through J.P.'s own efforts that she was able to see her son again—over one year after Defendant's employees forcibly separated her from him.

111.    Defendant had no discretion to implement the Family Separation Policy in violation of the *Flores* Agreement.

---

[68] FSA ¶ 11.

[69] FSA ¶ 12.A.

[70] *Id.*

[71] *Id.* ¶ 18.

### 3. Defendant's separation and treatment of J.P. and M.A. violated binding agency standards that govern CBP

112. CBP violated binding agency standards in its execution of the Family Separation Policy.

113. CBP's Short-Term Custody Policy ("Short-Term Custody Policy") sets nationwide policy for the short-term custody of individuals detained at facilities under the control of CBP.[72] The Short-Term Policy governs the custody and care of non-citizen detainees before their transfer to longer-term ICE detention facilities.

114. CBP's National Standards on Transport, Escort, Detention, and Search (the "TEDS Standards" or "TEDS") governs CBP officers' and employees' interaction with detained individuals.[73] Under the TEDS Standards, "[t]he safety of CBP employees, detainees, and the public is paramount during all aspects of CBP operations."[74]

115. The Short-Term Custody Policy and TEDS Standards were in place at the time the government devised and implemented its Family Separation Policy. Together, these agency standards govern CBP's required conduct and standards of care for both adult and child detainees in CBP custody. They supplement, but do not displace or otherwise alter, the government's obligations under the FSA concerning the custody and care of minor children.

### a. CBP violated nondiscretionary agency standards and policies that require the preservation of family unity

116. The TEDS require CBP to prioritize family unity, separating children from their parents only when "necessary."[75]

---

[72] *See* Short-Term Custody Policy at 2; *see also Short-Term Detention Standards and Oversight, Fiscal Year 2015 Report to Congress,* U.S. DEP'T OF HOMELAND SEC., U.S. CUSTOMS AND BORDER PROTECT. (Dec. 8, 2015), https://www.cbp.gov/sites/default/files/assets/documents/2022-Jan/Short-Term%20Detention%20Standards%20and%20Oversight_1.pdf.

[73] *See National Standards on Transport, Escort, Detention, and Search*, U.S. DEP'T OF HOMELAND SEC., U.S. CUSTOMS AND BORDER PROT. 3 (2015) ("TEDS"), https://www.cbp.gov/sites/default/files/assets/documents/2020-Feb/cbp-teds-policy-october2015.pdf.

[74] TEDS § 1.1.

[75] TEDS §§ 1.9, 4.3, 5.6.

COMPLAINT / CASE NO.

sf-5042791

117.    No legal requirement or safety or security concern required Plaintiffs' prolonged separation.  J.P. and M.A. arrived at a port of entry together.  CBP had no reason to doubt that M.A. was J.P.'s son.  J.P. presented CBP employees with her Honduran identification card and M.A.'s birth certificate, naming J.P. as his mother.  On information and belief, CBP employees manufactured an alien smuggling charge against J.P. to justify taking M.A. away from her.  The government separated J.P. and M.A. for the purpose of deterring other asylum seekers like them from seeking safety in the United States—not because the government had cause to believe that J.P. posed any threat or danger to M.A. or that she was otherwise unfit to care for him.

118.    Because there was no legitimate or compelling reason for the separation, and no law required the separation, CBP violated the applicable TEDS Standards by separating J.P. and M.A.

119.    CBP had no discretion to violate agency standards.

### b.    CBP failed to provide J.P. and M.A. with the adequate shelter and sanitary conditions required by its nondiscretionary agency standards and policies

120.    CBP policy mandates that "[a]ll detainees will be held under safe and humane conditions" and that "[a]ll detainees will be held under humane conditions of confinement that provide for their well being and general good health."[76]  CBP officers are required to provide detainees with access to restrooms.[77]  CBP must provide adult detainees with access to snacks and juice every four hours.[78]  Minors must be provided with meal service three times a day and "two of three meals must be hot."[79]  CBP must maintain temperatures "within a reasonable and comfortable range" and may not use temperature controls "in a punitive manner."[80]  And CBP officers are required to make clean drinking water available along with clean drinking cups.[81]

---

[76] Short-Term Custody Policy ¶¶ 7, 7.2.

[77] Short-Term Custody Policy ¶ 6.10.

[78] Short-Term Custody Policy ¶ 6.8.

[79] *Id.*; TEDS § 5.6.

[80] TEDS § 4.7.

[81] Short-Term Custody Policy ¶ 6.9; TEDS §§ 4.14, 5.6.

121.    CBP employees at the El Paso Processing Center violated their own policies and procedures by failing to provide J.P. and M.A. with access to a restroom.  Plaintiffs were only permitted to use a toilet once in approximately 18 hours.

122.    CBP employees further violated their own policies and procedures by subjecting Plaintiffs to intolerable cold by maintaining a cold temperature in the holding room and failing to provide Plaintiffs with any blanket or other source of warmth.

123.    CBP employees further violated their own policies and procedures by failing to provide J.P. and M.A. with food and drinking water, let alone hot meals for M.A.

124.    CBP had no discretion to fail to comply with its obligations under CBP's Short-Term Custody Policy and the TEDS Standards.

### c.    CBP degraded and humiliated J.P. and M.A. in violation of nondiscretionary agency standards and policies

125.    CBP employees "must treat all individuals with dignity and respect" and must carry out their duties "in a non-discriminatory manner, with respect to all forms of protected status under federal law" and with "full respect for individual rights including equal protection under the law [and] due process[.]"[82]  They must "speak and act with the utmost integrity and professionalism" and "conduct themselves in a manner that reflects positively on CBP at all times."[83]

126.    With respect to children, CBP officials must "consider the best interest of the juvenile at all decision points beginning at the first encounter and continuing through processing, detention, transfer, or repatriation."[84]  Officers and agents "should recognize that juveniles experience situations differently than adults" and treat them as an "at-risk population[]" who may require additional care or oversight given their "particular vulnerability."[85]

---

[82] TEDS § 1.4.

[83] TEDS § 1.2.

[84] TEDS § 1.6.

[85] TEDS §§ 1.6, 5.1.

sf-5042791

127.     CBP employees violated these standards by committing gratuitous acts of cruelty, including but not limited to yelling repeatedly that M.A. was not J.P.'s son and telling J.P. that she would see her son "maybe in fifteen years, if at all."

128.     CBP had no discretion to fail to comply with these mandatory obligations under CBP's Short-Terms Custody Policy and the TEDS Standards.

### 4.     Defendant's failure to facilitate contact between J.P. and M.A. violated binding standards that govern ICE

129.     ICE violated binding agency standards by failing to ensure contact between J.P. and M.A. during their prolonged separation.

130.     ICE is governed by the Performance-Based National Detention Standards ("PBNDS"),[86] established in 2011, which "are designed to ensure a safe and secure detention environment that meets detainees' basic needs and is consistent with applicable legal requirements."[87]  The PBNDS regulate ICE officers' conduct and set standards of care for individuals detained within ICE's network of dedicated immigration facilities.

131.     The PBNDS "Telephone Access" detention standard "ensures that detainees may maintain ties with their families and others in the community, legal representatives, consulates, courts and government agencies."[88]  In service of this goal, the PBNDS require detention facilities to "permit detainees to make direct or free calls" to "immediate family or others," when there is a personal or family emergency or "compelling need (to be interpreted liberally)."[89]  The PBNDS also require facilities to "take and deliver telephone messages to detainees as promptly as possible."[90]  Further, the PBNDS

---

[86] *Performance Based National Detention Standards*, U.S. IMMIGR. & CUSTOMS ENF'T, (rev. 2016), https://www.ice.gov/doclib/detention-standards/2011/pbnds2011r2016.pdf.

[87] *Barrientos v. CoreCivic, Inc.*, 951 F.3d 1269, 1272 (11th Cir. 2020).

[88] PBNDS § 5.6(I).

[89] PBNDS § 5.6(E).

[90] PBNDS § 5.6(J).

sf-5042791

mandate that "[d]etainees shall have reasonable and equitable access to reasonably priced telephone services."[91]

132.    Following J.P.'s release from criminal custody, she was transferred to ICE custody.  ICE officials denied J.P. the ability to communicate with her son by concealing his location from her.  When she eventually discovered M.A.'s location through her own efforts, ICE only permitted her one three-minute phone call with her son per week.  Further, ICE failed to provide J.P. with "reasonable and equitable access to reasonably priced telephone services."  J.P. could not afford the telephone fees at the facility.  The only way for J.P. to get the money to be able to speak to her son for a few minutes was by cleaning the facility, including after she injured her spine while completing that work.

133.    The PBNDS set forth the criteria that ICE employees must use to classify detainees for housing purposes.  ICE employees must reference "facts and other objective, credible evidence."[92] "Personal opinion, including opinions based on profiling, familiarity or personal experience, may not be considered in detainee classification."[93]

134.    ICE employees violated the PBNDS classification requirements by classifying J.P. as dangerous.  On information and belief, nothing in J.P.'s immigration files provided an objective basis on which an ICE employee properly following the PBNDS might classify her as dangerous.  J.P. had no criminal history other than the single alien smuggling charge, which had been dismissed.  ICE employees' misclassification of J.P. violated the PBNDS.

135.    ICE did not have discretion to violate its own regulations and standards of conduct.

**E.    J.P. and M.A.'s Harms and Losses**

136.    The psychological impact of J.P.'s and her son's separation has been severe.  J.P. was worried constantly about the wellbeing of her son and was in a state of despair and agony during their separation.  In the months after J.P. reunited with M.A., J.P. struggled enormously with daily tasks.  She hardly left the house because she was overwhelmed by loud noises and smells that reminded her of the

---

[91] PBNDS §§ 5.6(I), 5.6(II)(1).

[92] PBNDS § 2.2(C).

[93] *Id.*

conditions of her detention.  J.P. still feels depression and intense anxiety about the separation and detention and has required therapy to navigate what her psychologist describes as "major trauma."  J.P.'s psychologist has suggested that J.P. would benefit from psychiatric medication, but J.P. fears that if she takes medication, the government will take her children from her.  J.P. often startles awake in the middle of the night and fears that her son is missing.  She cannot relax until she checks on her son to make sure he is there.  J.P. is terrified of talking about what happened with her son and fears the year-long separation has impacted their relationship forever.  J.P. also lost an unhealthy amount of weight due to the separation and detention, only returning to a normal weight approximately a year after reunifying with her son.  Due to the conditions in detention, J.P. also has ongoing foot and vision problems.

137.    M.A. likewise continues to struggle.  In Honduras, M.A. had been a bright, high-achieving student.  After the separation from J.P., and even after reunifying, M.A. struggled academically.  His teachers told J.P. that he appeared to be sad in class and was very quiet.  In the first couple of years following the reunification, M.A. spent the majority of the time isolated in his room, not wanting to speak to anyone.  M.A. lashes out when J.P. tries to speak with him about anything that happened.  To this day, J.P. has not been able to speak with her son about his experience of the separation, despite her regular attempts to do so.

138.    The government's actions violated J.P. and her son's constitutional rights to liberty, family integrity, and safety, among others.  These actions were the direct result of a policy to intentionally inflict emotional distress on the parents and children who were separated.  It succeeded, with devastating consequences for mother and son in this case.

## COUNT I
## INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS

139.    Plaintiffs reallege and incorporate by reference the preceding allegations in this Complaint as if fully set forth herein.

140.    By engaging in the acts described in this Complaint, the federal officers and officials referenced above engaged in extreme and outrageous conduct with an intent to cause, or a reckless disregard of the probability of causing, Plaintiffs to suffer severe emotional distress.

141.   As a direct and proximate result of that conduct, Plaintiffs suffered severe emotional distress.

142.   Under the Federal Tort Claims Act, the United States is liable to Plaintiffs for intentional infliction of emotional distress.

**COUNT II**
**NEGLIGENCE**

143.   Plaintiffs reallege and incorporate by reference the preceding allegations in this Complaint as if fully set forth herein.

144.   The federal officers referenced above had a duty to Plaintiffs to act with ordinary care and prudence so as not to cause harm or injury to Plaintiffs.  They also had mandatory, non-discretionary duties including but not limited to, those imposed by the U.S. Constitution, the *Flores* consent decree, federal statute, and federal regulations.

145.   The federal officers referenced above violated those duties by *inter alia* forcibly subjecting Plaintiffs to prolonged separation without their consent.

146.   The federal officers referenced above violated those duties by *inter alia* subjecting Plaintiffs to inhumane detention conditions prior to their separation.

147.   The federal officers referenced above violated those duties by *inter alia* causing the separation of J.P. and M.A. while both were being held in immigration custody and failing to reunify J.P. and M.A. following the dismissal of J.P.'s criminal charge.

148.   The federal officers referenced above violated those duties by *inter alia* failing to develop and implement a system for tracking the existence of the parent-child relationship, withholding from J.P. any information about M.A.'s location or welfare, severely limiting Plaintiffs' ability to communicate with each other, and misleading Plaintiffs as to the possibility of reunification.

149.   By engaging in the acts alleged herein, the federal officers referenced above failed to act with ordinary care and breached their duty of care owed to Plaintiffs.

150.   As a direct and proximate result of the referenced conduct, Plaintiffs suffered substantial damages.

151.     Under the Federal Tort Claims Act, the United States is liable to Plaintiffs for negligence.

## COUNT III
## ABUSE OF PROCESS

152.     Plaintiffs reallege and incorporate by reference the preceding allegations in this Complaint as if fully set forth herein.

153.     Defendant's employees abused legal processes within their control when they mistakenly prosecuted J.P. under 8 U.S.C. § 1324 and used the erroneous prosecution in order to designate M.A. an unaccompanied minor.

154.     Defendant's employees improperly made the unaccompanied minor designation, relying on J.P.'s unwarranted prosecution under 8 U.S.C. § 1324 to justify the separation of J.P. and M.A. and to traumatize J.P. and M.A.

155.     Defendant's employees' abuse of process caused Plaintiffs severe harm, including emotional distress.

156.     Under the Federal Tort Claims Act, the United States is liable to Plaintiffs for abuse of process.

## COUNT IV
## MALICIOUS PROSECUTION

157.     Plaintiffs reallege and incorporate by reference the preceding allegations in this Complaint as if fully set forth herein.

158.     When J.P. presented herself and M.A. at the border to apply for asylum in January 2018, Defendant's employees accused J.P. of being a guide.

159.     By referring J.P. for prosecution for alien smuggling, Defendant's employees initiated or procured J.P.'s criminal prosecution.

160.     The prosecution of J.P. terminated in her favor when the charge was dismissed on February 23, 2018, at the prosecution's request.

COMPLAINT / CASE NO.

sf-5042791

161.    Defendant's employees lacked probable cause to initiate the prosecution of J.P. for alien smuggling, and J.P. was innocent of the charge.  As noted above, one of Defendant's officers told J.P. that her criminal prosecution was a mistake.

162.    In procuring J.P.'s prosecution for alien smuggling, Defendant's employees acted with malice.  On information and belief, Defendant's employees initiated the prosecution as a pretext for separating J.P. from M.A. and for the purpose of traumatizing J.P. and M.A.

163.    As was intended by Defendant's employees and as detailed above, J.P. suffered damages as a result of the prosecution.

164.    Under the Federal Tort Claims Act, the United States is liable to Plaintiffs for malicious prosecution.

**COUNT V**
**FALSE IMPRISONMENT**

165.    Plaintiffs reallege and incorporate by reference the preceding allegations in this Complaint as if fully set forth herein.

166.    Defendant's employees detained and imprisoned Plaintiffs when they were arrested while attempting to apply for asylum.  Plaintiffs at no point consented to or agreed to their detention for purposes of deterrence.

167.    Defendant's employees unlawfully used their authority to detain Plaintiffs for the illegal purpose of general deterrence, and unlawfully detained M.A. in violation of the *Flores* consent decree.

168.    Under the Federal Tort Claims Act, the United States is liable to Plaintiffs for false imprisonment.

**COUNT VI**
**CHILD ABDUCTION**

169.    Plaintiffs reallege and incorporate by reference the preceding allegations in this Complaint as if fully set forth herein.

170.    Ignoring J.P.'s protests and extreme distress, Defendant's employees intentionally and forcibly separated J.P. and M.A. for over one year.

---

37
COMPLAINT / CASE NO.

171.     On information and belief, at no time did Defendant's employees investigate or make any finding regarding whether J.P. presented a danger to M.A. or was in any way unfit to maintain care and custody of her then ten-year-old son.

172.     In addition to taking and retaining possession of M.A., Defendant's employees concealed M.A.'s whereabouts from J.P.  For almost two months following the separation, J.P. did not know where her son was located.  It was only through J.P.'s own efforts that she was able to ascertain her son's location.

173.     Defendant's employees were in possession of evidence that J.P. is M.A.'s biological mother and that she had lawful custody of her son.  At the Paso del Norte Port of Entry, J.P. presented CBP officers with her Honduran identity card and M.A.'s birth certificate naming J.P. as his mother.  On information and belief, no federal officer, official, or employee had any basis to contest their parent-child relationship or J.P.'s lawful custody of M.A.

174.     Defendant's employees were aware that J.P. did not consent to have her child taken away from her.  Indeed, as noted above, J.P. strenuously objected to the separation as Defendant's employees took M.A. away.  And throughout her detention, J.P. repeatedly requested to be reunified with her son.

175.     As a direct and proximate result of Defendant's conduct described herein, Plaintiffs suffered substantial damages stemming from their mental anguish, interference with their parent-child relationship, emotional and psychological trauma, and physical manifestations of trauma, anxiety, and stress.

176.     Under the Federal Tort Claims Act, the United States is liable to Plaintiffs for child abduction.

**COUNT VII**
**LOSS OF CONSORTIUM**

177.     Plaintiffs reallege and incorporate by reference the preceding allegations in this Complaint as if fully set forth herein.

sf-5042791

178.    Plaintiffs have suffered severe, permanent, and disabling injuries.  They now must contend with the long-term health effects and emotional and psychological trauma caused by Defendant's employees.

179.    The wrongful conduct of Defendant's employees directly and proximately caused these injuries, which substantially interfere with J.P.'s and M.A.'s capacity to interact with one another in a normally gratifying way and has caused Plaintiffs to suffer damages as a result.  As noted above, after J.P. and M.A. reunified over a year after their forced separation, M.A. began lashing out at his mother.

180.    Under the Federal Tort Claims Act, the United States is liable to Plaintiffs for loss of consortium.

### DEMAND FOR JURY TRIAL

FTCA claims are tried to the bench.  28 U.S.C. § 2402.  Plaintiffs demand a jury trial on any claims that are, at the time of trial, triable by jury, whether because of a change of law or an amendment to the pleadings.

### PRAYER FOR RELIEF

**WHEREFORE,** Plaintiffs respectfully request:

A.  Compensatory damages;

B.  Attorneys' fees and costs pursuant to, among other provisions, the Equal Access to Justice Act, 28 U.S.C. § 2412; and

C.  Such other and further relief as the Court deems just and appropriate.

Dated:  April 3, 2023

MORRISON & FOERSTER LLP
ELLIS LEGAL, P.C.

By:_____/s/ JOHN C. ELLIS_____
DARALYN J. DURIE
MATTHAEUS MARTINO-WEINHARDT
BETHANY D. BENGFORT
HANNA M. LAURITZEN
JOHN C. ELLIS
JUSTIN DELUCA
DAVID DESCHEPPER
SOPHIA MAIETTA

Attorneys for Plaintiffs J.P.,
on her own behalf and on

39

COMPLAINT / CASE NO.

sf-5042791

her minor child's behalf

COMPLAINT / CASE NO.

sf-5042791

**CERTIFICATE OF SERVICE**

  I hereby certify that on April 3, 2023 the within document was filed with the Clerk of the Court using CM/ECF.  I further certify that a request for summons to be issued to the Defendant is being submitted and, once issues, will be sent, along with this document, to the following address:

    Gregory K. Harris
    U.S. Attorney for CDIL
    U.S. Department of Justice
    318 S. Sixth Street
    Springfield, IL 62701

    Merrick B. Garland
    Office of the Attorney General
    U.S. Department of Justice
    950 Pennsylvania Avenue NW
    Washington, D.C., 20530

           /s/ JOHN C. ELLIS
         _____

sf-5042791