**IN THE**
**UNITED STATES DISTRICT COURT**
**CENTRAL DISTRICT OF ILLINOIS**
**PEORIA DIVISION**

| | |
|---|---|
| J.P., on her own behalf and on behalf of her minor child, M.A., | No. 1:23-cv-01136-JES-JEH |
| Plaintiffs, | |
| v. | |
| United States of America, | |
| Defendant. | |

**PLAINTIFFS' OPPOSITION TO DEFENDANT'S MOTION TO DISMISS**

***ORAL ARGUMENT REQUESTED PURSUANT TO CIVIL LR 7.1(A)(2)***

# TABLE OF CONTENTS

Page

INTRODUCTION ................................................................................................ 1

REQUEST FOR ORAL ARGUMENT ............................................................. 1

STATEMENT OF FACTS .................................................................................. 1

I.     PLAINTIFFS WERE SEPARATED PURSUANT TO A MANDATORY
FAMILY SEPARATION POLICY ........................................................... 1

     A.    Public Records Indicate That the Family Separation Policy Began as Early
as July 2017 ........................................................................................... 3

     B.    Government Officials Unnecessarily Prolonged Plaintiffs' Separation for
Over One Year ....................................................................................... 5

LEGAL STANDARD ......................................................................................... 8

ARGUMENT ....................................................................................................... 9

I.     PLAINTIFFS' CLAIMS ARE TIMELY ................................................. 9

     A.    Plaintiffs Adequately Allege a Continuing Violation ............................. 9

     B.    Plaintiffs Are Entitled to Equitable Tolling .......................................... 12

II.    THE FTCA'S EXCEPTIONS DO NOT REQUIRE DISMISSAL OF
PLAINTIFFS' CLAIMS .......................................................................... 14

     A.    The Discretionary Function Exception Does Not Apply to Plaintiffs'
Claims .................................................................................................. 16

          1.    Plaintiffs Were Separated Pursuant to the Family Separation Policy ...... 18

          2.    Defendant Has Not Established That the DFE Applies to the
Decision to Refer J.P. for Criminal Prosecution ..................................... 19

          3.    Defendant Has Not Established That the DFE Applies to the
Decision to Separate Plaintiffs ............................................................... 21

          4.    Defendant Has Not Established That the DFE Applies to the
Decisions to Subject Them to Intolerable Conditions of
Confinement ........................................................................................... 23

     B.    The Due Care Exception Does Not Apply to Plaintiffs' Claims .............. 25

          1.    The *Welch* Test—Not *Dupree*—Is the Proper Test for the Due
Care Exception ....................................................................................... 25

          2.    No Statute or Regulation Prescribed the Course of Action
Government Officials Took Toward J.P. and M.A. ................................. 26

          3.    Government Officials Did Not Exercise Due Care .................................. 27

     C.    The Independent Contractor Exception Does Not Apply to Plaintiffs'
Claims .................................................................................................. 27

III.   THE GOVERNMENT'S TORTIOUS ACTS HAVE A PRIVATE ANALOG ....... 28

**TABLE OF CONTENTS**
(continued)

Page

IV.   PLAINTIFFS ADEQUATELY STATE CLAIMS FOR RELIEF UNDER
      TEXAS LAW.................................................................................................**30**

      A.    Defendant Cannot Claim Sweeping Privilege Under Texas Law.......................30

      B.    Plaintiffs State a Claim for Intentional Infliction of Emotional Distress............32

      C.    Plaintiffs State a Claim for Negligence ........................................................34

      D.    Plaintiffs State a Claim for Abuse of Process...............................................34

      E.    Plaintiffs State a Claim for Malicious Prosecution.........................................35

      F.    Plaintiffs State a Claim for False Imprisonment............................................36

      G.    Plaintiffs State a Claim for Child Abduction..................................................36

      H.    Plaintiffs State a Claim for Loss of Consortium.............................................37

CONCLUSION .....................................................................................................**37**

# **TABLE OF AUTHORITIES**

**Page(s)**

**Cases**

*A.E.S.E. v. United States*,
    2022 WL 4289930 (D.N.M. Sept. 16, 2022) ................................................. *passim*

*A.F.P. v. United States*,
    2022 WL 2704570 (E.D. Cal. July 12, 2022) ......................................16, 25, 27, 28

*A.I.I.L. v. Sessions*,
    2022 WL 992543 (D. Ariz. Mar. 31, 2022) ..............................................................16

*A.P.F., v. United States*,
    492 F. Supp. 3d 989 (D. Ariz. 2020) ....................................................16, 22, 27

*Alexander v. United States*,
    721 F.3d 418 (7th Cir. 2013) ........................................................................ *passim*

*Alvarez-Portillo v. United States*,
    2005 WL 2898024 (W.D. Mo. Nov. 1, 2005).........................................................25

*Ates v. United States*,
    2023 WL 1765991 (S.D. Ind. Feb. 2, 2023) ............................................................8

*Avalos-Palma v. United States*,
    2014 WL 3524758 (D.N.J. July 16, 2014),.............................................13, 14, 30

*B.Y.C.C. v. United States*,
    2023 WL 5237174 (D.N.J. Aug. 15, 2023) ................................................. *passim*

*Bailor v. Salvation Army*,
    51 F.3d 678 (7th Cir. 1995) ....................................................................................21

*Berkovitz v. United States*,
    486 U.S. 531 (1988).........................................................................14, 16, 19, 21

*Blanco Ayala v. United States*,
    982 F.3d 209 (4th Cir. 2020) ..................................................................................20

*Bodner v. Banque Paribas*,
    114 F. Supp. 2d 117 (E.D.N.Y. 2000) ...................................................................11

*Brownback v. King*,
    141 S. Ct. 740 (2021).......................................................................................15, 28

*Bunch v. United States,*
    880 F.3d 938 (7th Cir. 2018) ................................................25

*C.D.A.v. United States,*
    2023 WL 2666064 (E.D. Pa. Mar. 28, 2023) ................................. *passim*

*C.M. v. United States,*
    2020 WL 1698191 (D. Ariz. Mar. 30, 2020) ................................16, 31

*C.M. v. United States,*
    2023 WL 3261612 (W.D. Tex. May 4, 2023) ........................................16

*Caban v. United States,*
    728 F.2d 68 (2d Cir. 1984)................................................32

*Caterpillar Inc. v. Williams,*
    482 U.S. 386 (1987)........................................................22

*Cooper v. Trent,*
    551 S.W.3d 325 (Tex. App. 2018)........................................29

*Corpeno-Argueta v. United States,*
    341 F.Supp.3d 856 (N.D. Ill. 2018) ................................8, 15, 16

*D.A. v. United States,*
    2023 WL 2619167 (W.D. Tex. Mar. 23, 2023) ........................... *passim*

*D.J.C.V. v. Immgr. & Customs Enf't,*
    2018 WL 10436675 (S.D.N.Y. Oct. 15, 2018) ................................19

*D.J.C.V. v. United States,*
    605 F. Supp. 3d 571 (S.D.N.Y. 2022)........................16, 25, 31

*Davila v. United States,*
    713 F.3d 248 (5th Cir. 2013) ................................................32

*Dupree v. United States,*
    247 F.2d 819 (3d Cir. 1957)........................................25

*E.C.B. v. United States,*
    No. CV-22-00915 (D. Ariz. Nov. 8, 2022), ECF No. 24 ....................16

*E.S.M. v. United States,*
    2022 WL 11729644 (D. Ariz. Oct. 20, 2022) ................................16

*F.R. v. United States,*
    2022 WL 2905040 (D. Ariz. July 22, 2022) ................................16

*Flores Benitez v. Miller*,
   2023 WL 5290855 (D. Conn. Aug. 17, 2023) .......................................................27

*Fuentes-Ortega v. United States*,
   2022 WL 16924223 (D. Ariz. Nov. 14, 2022) ...............................................16, 31

*Gen. Dynamics Corp. v. United States*,
   139 F.3d 1280 (9th Cir. 1998) ...........................................................................20

*Hatahley v. United States*,
   351 U.S. 173 (1956)...........................................................................................27

*Heard v. Sheahan*,
   253 F.3d 316 (7th Cir. 2001) ..............................................................10, 11, 12

*Hernandez v. United States*,
   2018 WL 4103015 (S.D. Tex. July 2, 2018)......................................................32

*Hill v. United States*,
   180 F. Supp. 3d 578 (S.D. Ill. 2016)...........................................................12, 13, 14

*Hinojosa v. City of Terrell*,
   Tex. 834 F.2d 1223 (5th Cir. 1988) ...................................................................31

*Hunt v. Baldwin*,
   68 S.W.3d 117 (Tex. App. 2001)..............................................................29, 34, 35

*I.T. v. United States*,
   No. 22-cv-05333 (N.D. Cal. 2022) ....................................................................16

*Indian Towing Co. v. United States*,
   350 U.S. 61 (1955)..............................................................................................29

*J.P. v. United States*,
   2023 WL 4237331 (D. Ariz. June 28, 2023) .....................................................16

*Jacinto-Castanon de Nolasco v. U.S. Immigr. & Customs Enf't*,
   319 F. Supp. 3d 491 (D.D.C. 2018) ...................................................................19

*K.O. v. United States*,
   2023 WL 131411 (D. Mass. Jan. 9, 2023) ...................................................... *passim*

*Keller v. United States*,
   771 F.3d 1021 (7th Cir. 2014) ...........................................................................17

*Linder v. United States*,
   937 F.3d 1087 (7th Cir. 2019) ...........................................................................20

*Liranzo v. United States*,
    690 F.3d 78 (2d Cir. 2012)............................................................................29, 30

*Loumiet v. United States*,
    968 F. Supp. 2d 142 (D.D.C. 2013) .............................................................11, 12

*Lyttle v. United States*,
    867 F. Supp. 2d 1256 (M.D. Ga. 2012) .......................................................25, 30

*McCoy v. United States*,
    731 F. App'x 524 (7th Cir. 2018) ................................................................15, 16

*McElroy v. United States*,
    861 F. Supp. 585 (W.D. Tex. 1994).....................................................................32

*Moher v. United States*,
    875 F. Supp. 2d 739 (W.D. Mich. 2012) .............................................................25

*Ms. L v. U.S. Immigr. & Customs Enf't*,
    330 F.R.D. 284 (S.D. Cal. 2019) ................................................................ *passim*

*Nguyen v. United States*,
    2001 WL 637573 (N.D. Tex. June 5, 2001),
    *aff'd,* 65 Fed. App'x. 509 (5th Cir. 2003)...........................................................32

*Nunez Euceda v. United States*,
    2021 WL 4895748 (C.D. Cal. Apr. 27, 2021) ......................................................16

*Palay v. United States*,
    349 F.3d 418 (7th Cir. 2003) ..........................................................16, 17, 20, 22

*Pedrote-Salinas v. Johnson*,
    2018 WL 2320934 (N.D. Ill. May 22, 2018) .......................................................12

*Peña Arita v. United States*,
    470 F. Supp. 3d 663 (S.D. Tex. 2020) .................................................................16

*Reagan v. Vaughn*,
    804 S.W.2d 463 (Tex. 1990)........................................................................29, 37

*Reynolds v. United States*,
    549 F.3d 1108 (7th Cir. 2008) .........................................................15, 19, 20, 21

*Richey v. Brookshire Grocery Co.*,
    952 S.W.2d 515 (Tex. 1997).......................................................................35, 36

*Roe v. United States*,
    2019 WL 1227940 (S.D.N.Y. Mar. 15, 2019) .....................................................30

*Ruiz v. United States*,
   2014 WL 4662241 (E.D.N.Y. Sept. 18, 2014) ........................................................17, 22, 23

*Ryan v. Immigr. & Customs En'f*,
   974 F.3d 9 (1st Cir. 2020) ........................................................................................30

*S.E.B.M. v. United States*,
   2023 WL 2383784 (D.N.M. Mar. 6, 2023)................................................................. *passim*

*Salazar v. Collins*,
   255 S.W.3d 191 (Tex. App. 2008)............................................................................29

*Sanders v. Moss*,
   2023 WL 2164520 (C.D. Ill. Jan. 24, 2023) ..........................................................10

*Sea Air Shuttle Corp. v. United States*,
   112 F.3d 532 (1st Cir. 2020) ....................................................................................30

*Silcott v. Oglesby*,
   721 S.W.2d 290 (Tex. 1986)..............................................................................29, 36, 37

*Smith v. Smith*,
   720 S.W.2d 586 (Tex. Civ. App. 1986) ..................................................................36

*Smith v. United States*,
   375 F.2d 243 (5th Cir. 1967) ..................................................................................20

*Summerville v. Allied Barton Sec. Servs.*,
   248 S.W.3d 333 (Tex. App. 2007)............................................................................35

*Thrift v. Hubbard*,
   974 S.W.2d 70 (Tex. App. 1998)..............................................................................29

*Twyman v. Twyman*,
   855 S.W.2d 619 (Tex. 1993)......................................................................................29

*Ugalde v. W.A. McKenzie Asphalt Co.*,
   990 F.2d 239 (5th Cir. 1993) ....................................................................................34

*United States v. Olson*,
   546 U.S. 43 (2005)..............................................................................................28, 31

*United States v. Wong*,
   575 U.S. 402 (2015)........................................................................................9, 12, 15

*Villafranca v. United States*,
   587 F.3d 257 (5th Cir. 2009) ....................................................................................32

*Wal-Mart Stores, Inc. v. Rodriguez*,
 92 S.W.3d 502 (Tex. 2002)........................................................................29

*Weirich v. Weirich*,
 796 S.W.2d 513 (Tex. Civ. App.-San Antonio 1990),
 *rev'd on other grounds*, 833 S.W.2d 942 (Tex. 1992)............................36

*Welch v. United States*,
 409 F.3d 646 (4th Cir. 2005) ...............................................................25, 27

*Wilbur P.G. v. United States*,
 2022 WL 3024319 (N.D. Cal. May 10, 2022) .........................................16

*Wilson v. Monarch Paper Co.*,
 939 F.2d 1138 (5th Cir. 1991) ...............................................................34

## Statutes

6 U.S.C. § 279(g) ...........................................................................................22

8 U.S.C. § 1231(g)(1) .....................................................................................21

8 U.S.C. § 1232(b)(3) .....................................................................................26

8 U.S.C. § 1324.....................................................................................2, 3, 18

28 U.S.C. § 1346.............................................................................................28

28 U.S.C. § 1346(b).................................................................................15, 30

28 U.S.C. § 2401(b)..........................................................................................9

28 U.S.C. § 2671.......................................................................................14, 15

28 U.S.C. § 2674.............................................................................................28

28 U.S.C. § 2680...............................................................................14, 15, 21, 31

Tex. Fam. Code § 151.001(a) .......................................................................37

## Rules

Fed. R. Civ. P. 12(b)(1)......................................................................8, 15, 28

Fed. R. Civ. P. 12(b)(6)...................................................................8, 9, 15, 18

## INTRODUCTION

Plaintiffs M.A. and J.P. came to the United States to seek asylum.  Instead, the mother and child encountered a cruel and punishing federal policy of forced family separation.  Plaintiffs bring this lawsuit under the Federal Tort Claims Act ("FTCA") seeking redress for the trauma that government officials inflicted on them.  Defendant's motion relies on disputed facts to portray what government officials did to Plaintiffs as routine enforcement of criminal and immigration law.  As detailed fully in the factual allegations in the Complaint, which must be accepted as true at this stage, it was not.

Defendant "does not defend" the mandatory family separation policy.  Instead, despite Plaintiffs' allegations that the family separation policy began as early as July 2017, and continued throughout January 2018 when Plaintiffs applied for asylum at the border, Defendant argues that this policy was not in place when it forcibly separated Plaintiffs.  Also, despite Plaintiffs' allegations that J.P.'s criminal prosecution was a pretext for separating Plaintiffs in accordance with the family separation policy, Defendant argues that it was required to separate Plaintiffs because of that criminal prosecution.  Defendant's factual contentions do not provide a proper basis for dismissal on the pleadings.  Moreover, Defendant has not carried its burden to show that an exception to the FTCA insulates it from liability.  This Court should deny the Motion to Dismiss.

## REQUEST FOR ORAL ARGUMENT

Because Defendant seeks dismissal of Plaintiffs' complaint in its entirety, and because of the complex legal issues in this case, Plaintiffs respectfully request oral argument on Defendant's Motion to Dismiss before this Court.

## STATEMENT OF FACTS

## I.   PLAINTIFFS WERE SEPARATED PURSUANT TO A MANDATORY FAMILY SEPARATION POLICY

Plaintiffs arrived at the United States–Mexico border on or around January 13, 2018. (Compl. ¶ 44.)  Plaintiffs had fled Honduras after gang members threatened to kill J.P. because of

her outspoken political opinions. (*Id*. ¶ 43.) J.P. wanted to follow the law, and so she took her son to an official port of entry at the border to apply for asylum. (*Id.* ¶ 45.) At the checkpoint, J.P. truthfully told the Customs and Border Protection ("CBP") officer that she and her son did not have documents to enter the United States, and that they were seeking asylum. (*Id.* ¶ 46.) J.P. presented her Honduran identity card and M.A.'s birth certificate naming J.P. as his mother. (*Id.*)

Despite the Honduran identity card and birth certificate, a CBP officer told M.A. that J.P. was not his mother. (*Id.* ¶ 47.) Then, without warning or cause, CBP officers became very aggressive with J.P., accusing her of being a smuggler. (*Id.* ¶ 48.) The officers repeatedly yelled that M.A. was not J.P.'s son. (*Id.*) CBP officers arrested J.P. and referred her for prosecution of alien smuggling, 8 U.S.C. § 1324, a felony. (*Id.*) Plaintiffs allege that J.P.'s arrest and prosecution were based on false information (*id.* ¶ 49 & n.50) and served as a pretext to forcibly separate her from her son (*id.* ¶¶ 3, 54-55, 162).

In CBP custody, officers took M.A. away from his mom several times to interview him. (*Id.* ¶ 50.) Each time he returned to J.P. sobbing inconsolably. (*Id.*) The officers' treatment of M.A. caused J.P. extreme worry for his health because M.A. had a heart murmur. (*Id.*) Officers held J.P. and M.A. in an intolerably cold room overnight, with nothing but a thin mat separating Plaintiffs from the floor and without a blanket or anything else to keep them warm. (*Id.* ¶ 51.) Officers did not provide them with food or water at any point and did not allow them to bathe or brush their teeth. (*Id.* ¶ 52.) Plaintiffs allege that the conditions in which they were held violated federal law and policy. (*Id.* ¶ 53.)

At around 10 a.m. the next day, CBP officials told J.P. to say goodbye to her son. (*Id.* ¶ 54.) One CBP officer told J.P. that she would see her son "maybe in fifteen years, if at all." (*Id.*) Despite J.P.'s panicked questions, the officers gave J.P. no further information on why she was being separated from her son or where M.A. was going. (*Id.*) CBP officers then forcibly removed M.A. from his mother, ignoring J.P. and M.A.'s protests and extreme distress. (*Id.* ¶ 55.)

What Plaintiffs did not know when they applied for asylum at the border in January 2018 was that immigration officials had begun—as early as July 2017—forcibly separating parents and children like Plaintiffs as part of a mandatory executive policy to deter asylum seekers.

A.      **Public Records Indicate That the Family Separation Policy Began as Early as July 2017**

The "Family Separation Policy," formerly known as the "Zero Tolerance Policy," was announced by Attorney General Jefferson Beauregard Sessions III on April 6, 2018.  (Compl. ¶ 27.)  This policy mandated the criminal prosecution of all persons who crossed the U.S. border, regardless of whether they were legally seeking asylum or arriving with children.  (*Id.*)  The purpose of the policy—as evidenced by statements from high-level officials—was to inflict harm on immigrants arriving at the Southern border to discourage migration and deter asylum seekers.  (*Id.* ¶¶ 28, 33.)  Government officials implemented the policy knowing that separating families would cause significant harm, particularly to children.  (*Id.* ¶¶ 29-30.)  But the harm did not stop at the separation itself.  Guided by the policy, immigration officers subjected detained families to inhumane conditions in detention, including holding families in intolerably cold conditions, refusing to provide food or clean drinking water, and denying access to a restroom.  (*Id.* ¶ 31.)

Although the policy was not made public until April 2018, public records indicate that the policy began much earlier:

- In April 2017, former Attorney General Sessions issued a memorandum asking federal prosecutors to prioritize criminal enforcement of immigration-related offenses, including violations of 8 U.S.C. § 1324 (Compl. ¶ 19), the charge government officials used against Plaintiff J.P.  DHS officials interviewed by the GAO stated that, after the Attorney General's memo, there was an increase in the number of noncitizens referred by CBP to DOJ for prosecution of immigration-related offenses.  (*Id.* ¶ 24.)  Parents who were criminally prosecuted were—like Plaintiff J.P.—taken into U.S. Marshals Service custody and separated from their children.  (*Id.*)

- In June 2017, ICE terminated the Family Case Management Program.  Ending that program—which allowed asylum seekers to remain in the community during the pendency of their proceedings—signaled the initiation of a coordinated policy of subjecting asylum seekers to prolonged detention.  (*Id.* ¶ 20.)

- The next month, the government launched a family separation pilot program in CBP's El Paso sector.  (*Id.*)  Under the pilot program, the government aggressively prosecuted parents who crossed the border with children.  (*Id.*)  The prosecutions were a pretext for the government to forcibly separate the children from their parents, designate the children as "unaccompanied minors," and place the children in the custody of the Department of Health and Human Services ("HHS") Office of Refugee Resettlement ("ORR").  (*Id.*)  The government made no attempt to keep track of the parent-child relationships, and as a result, parents and children who were separated were unable to communicate or receive information about each other's locations or wellbeing.  (*Id.*)

- In December 2017, eight organizations sent a letter to the DHS Office for Civil Rights and Civil Liberties and the DHS Acting Inspector General, urging an investigation into DHS's separation of family members in CBP custody at the border and calling for an end to the "practice of separating families for purposes of punishment and deterrence."  (*Id.* ¶ 22.)

- Between late 2017 and early 2018, ORR staff in Arizona (where M.A. was held in a shelter) and Texas noted an increase in the number of children separated from their parents.  (*Id.* ¶ 24.)

- On February 8, 2018, members of Congress sent a letter to DHS Secretary Nielsen expressing their concern that DHS was "intentionally" separating immigrant families along the United States–Mexico border.  (*Id.* ¶ 25.)

- On January 17, 2019, the HHS Office of Inspector General ("OIG") issued a report "reveal[ing] the [DOJ] and [DHS] began separating migrant families as early as July 1, 2017, well before the zero tolerance policy was publicly announced in May of 2018[.]" *Ms. L v. U.S. ICE*, 330 F.R.D. 284, 286-87 (S.D. Cal. 2019).

In short, the record indicates that while the government did not publicly announce the Family Separation Policy until April 2018, it began as early as July 2017 and was in place when Plaintiffs arrived at the border in January 2018.  Moreover, as explained below, Plaintiff J.P.'s membership in the class of parents in *Ms. L* (Compl. ¶ 9) demonstrates that Plaintiffs were separated pursuant to the Family Separation Policy.

## B. Government Officials Unnecessarily Prolonged Plaintiffs' Separation for Over One Year

Throughout their separation, federal employees refused to take action to reunite mother and son, unnecessarily prolonging their separation to a period of over one year.  At the shelter in Arizona, Plaintiff M.A. asked an official when he would see his mother again.  (Compl. ¶ 57.)  The official replied, "never."  (*Id.* ¶ 57.)  For nearly the entire two months that M.A. was at the shelter, his mother, J.P., did not know where her son was.  (*Id.* ¶¶ 59-60, 64.)  M.A. was released from ORR custody—but not to his mother—on or about March 11, 2018.  (*Id.* ¶ 59.)

As soon as J.P. arrived in immigration detention after the criminal charges against her were dismissed, she began asking officials where her son was and expressing concern for his wellbeing.  (*Id.* ¶¶ 68, 70.)  She wrote several letters asking to speak with the officer in charge of the detention facility so that she could ask for information about her son.  (*Id.*)  Despite her pleas, federal employees never told her where M.A. was.  (*Id.*)  Instead, as the government did throughout Plaintiffs' separation, federal employees left it to J.P. to figure out her son's whereabouts.  J.P. discovered the location of her son through her own persistence and that of a friend.  (*Id.*)  Even once J.P. discovered that M.A. was in Arizona, Federal employees refused to provide her with the address of the shelter.  (*Id.* ¶ 70.)  Plaintiffs allege that this was the result of federal officers' negligence in failing to develop and implement a system for tracking the existence of the parent-child relationship after separation (*id.* ¶ 148), one of the hallmarks of the Family Separation Policy.  (*See id.* ¶¶ 36-37.)

In the meantime, J.P. continued to pursue her asylum claim and sought release from detention.  On or about March 4, 2018, J.P.'s deportation officer told her that her criminal charges

were a mistake and that she could collect documents to request that she be released from detention. (*Id.* ¶ 71.) J.P. met the first requirement for her asylum claim on March 9, 2018, when she passed her credible fear interview. (*Id.* ¶ 72.) J.P. submitted a request for release from detention, explaining that the criminal charges against her—which had already been dismissed—were a mistake. (*Id.* ¶¶ 65, 73.) J.P. also stated that she had been separated from her son, who had a heart condition. (*Id.* ¶ 73.) Even though J.P. had passed her credible fear interview and had been cleared of any criminal charges, the government rejected her application for release on the basis that she was dangerous and a threat to the United States. (*Id.* ¶ 74.)

After the government rejected J.P.'s application for release, the immigration judge told J.P. that pursuing her asylum claim (while detained) would take over one year and that, without a lawyer, pursuing her claim was pointless. (*Id.* ¶¶ 75-76.) The judge told J.P. that if she wanted to be released from detention sooner, she could consent to deportation. (*Id.* ¶ 76.) At this point, with the government already having denied J.P.'s request for release, J.P. felt she had no other choice than to accept deportation. (*Id.*) This meant abandoning her asylum claim—despite the fact that she had passed her credible fear interview—and returning to a country where she faced credible threats to her life. (*See id.* ¶¶ 43, 81.)

The limited official documents J.P. has been able to obtain from her detention show that she made numerous attempts to obtain her son's contact information, convey concern for her son, and request their reunification. (*Id.* ¶¶ 70, 77.) J.P.'s efforts continued even after she agreed to accept deportation. (*See id.* ¶ 77.) As late as May 17, 2018, J.P. is recorded as having "request[ed] to be repatriated with [her] son." (*Id.*) Instead, federal employees deported J.P. from the United States on or about June 6, 2018. (*Id.* ¶ 79.)

During the period that J.P. was in Honduras, the government continually refused to take steps to reunify J.P. and M.A. Within weeks of J.P.'s deportation, in *Ms. L*, Judge Sabraw issued a preliminary injunction requiring the government to reunify families separated at the border. (*Id.* ¶ 39.) In implementing that order, the government limited its application "to parents whose children were 'detained in ORR custody, ORR foster care, or DHS custody' on the date the

6

preliminary injunction was issued, June 26, 2018." *Ms. L*, 330 F.R.D. at 287.  The government did not include parents like Plaintiff J.P., "whose children were released from ORR custody *before* June 26, 2018." *Id.* (emphasis in original).

In November 2018, plaintiffs' counsel in *Ms. L* notified the court of what they understood to be a "handful" of cases of parents who were separated from their children at the border and whose children were released from ORR custody before the court's preliminary injunction.  *Id.* at 287.  The government agreed to stay removal of these parents.  *Id.* at 287-88.  Then, in January 2019, HHS OIG issued its report revealing that the DOJ and DHS "began separating migrant families as early as July 1, 2017," before the announcement of the Zero Tolerance Policy, "and that pursuant to the policy, potentially 'thousands' more families had been separated."  *Id.* at 286-87; *see also id.* at 288.  In an order modifying the class definition to include such parents, Judge Sabraw rejected the government's argument that such information had been known when the court issued its preliminary injunction in June 2018, citing the government's representations to the court—as late as May of 2018—that there was no policy or practice of separating families at the border.  *Id.* at 288.

Judge Sabraw also determined that "the difficulty in identifying proposed class members [was] the result of Defendants' own record keeping practices, or lack thereof."  *Id.* at 290.  Modifying the class definition was necessary because "[u]nless members of the newly proposed class are identified, it will remain unknown how many of them, if any, were . . . removed without their children[,]" a phenomenon Judge Sabraw called "the harsh reality of this case[.]" *Id.* at 291.

Importantly, there was "no dispute" that parents whose children were released from ORR custody before the preliminary injunction—like Plaintiff J.P.—were also subjected to the Family Separation Policy.  *Id.* at 289.  "Like the current members of the class, they, too, were separated from their children by DOJ and DHS, their children were placed in ORR custody, and they were not reunified with their children despite the absence of any finding they were unfit parents or presented a danger to their children." *Id.*

As the government delayed taking any action to reunite parents and children like Plaintiffs, J.P. "became so depressed that she contemplated suicide." (Compl. ¶ 81.) J.P. was desperate to reunite with her son, but understood her only option to be returning to the United States unlawfully. (*See id.* ¶ 82.) And so, J.P. "journeyed across the border on foot, crossing a river and other dangers," arriving in the United States on February 7, 2019. (*Id.*)

When J.P. returned to the United States, federal employees failed to reunite mother and son. (*Id.* ¶¶ 83-86.) Instead, federal employees mocked J.P. after looking up her information in a computer, detained her again "for several days with extremely little food and water and nothing to sleep on," and then told her that the government was releasing her from detention, "even though we shouldn't." (*Id.* ¶¶ 83-84.) A church provided J.P. access to a phone, which she used to call her friend in Illinois, who bought her a bus ticket. (*Id.* ¶ 85.) Once again, the government left it up to J.P. to figure out how to reunite with her son.

## LEGAL STANDARD

The Court should deny a motion to dismiss where plaintiffs meet the "relatively low bar" of alleging facts which, "when accepted as true . . . state a claim to relief that is plausible on its face." *Alexander v. United States*, 721 F.3d 418, 422, 425 (7th Cir. 2013) (quoting *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). "Plaintiffs are not required to plead around affirmative defenses, and an affirmative defense may be the basis for a Rule 12(b)(6) dismissal only 'if the complaint alone alleges enough facts to eliminate all doubt about' the affirmative defense." *Ates v. United States*, 2023 WL 1765991, at *5 (S.D. Ind. Feb. 2, 2023) (quoting *Talevski ex rel. Talevski v. Health & Hosp. Corp. of Marion Cnty.*, 6 F.4th 713, 721 (7th Cir. 2021)).

On a motion to dismiss under Rule 12(b)(1), "the Court accepts all well-pleaded factual allegations as true and draw[s] all reasonable inferences in favor of the Plaintiff." *Corpeno-Argueta v. United States*, 341 F. Supp. 3d 856, 860 (N.D. Ill. 2018). "In ruling on the motion, the district court also may look beyond the jurisdictional allegations" and consider evidence "to determine whether subject matter jurisdiction exists." *Id.*

**ARGUMENT**

The Court should deny Defendant's Motion to Dismiss.  First, because Plaintiffs diligently filed their administrative FTCA claims less than two years after the date of their reunification, Plaintiffs' claims are timely.  Second, Defendant has failed to meet its burden to establish that any of the exceptions to the FTCA bars Plaintiffs' claims.  Third, because a private-person analog exists for each of Plaintiffs' claims, this Court has subject matter jurisdiction.  Finally, Plaintiffs have adequately pled their claims of intentional infliction of emotional distress ("IIED"), negligence, abuse of process, malicious prosecution, false imprisonment, child abduction, and loss of consortium, despite Defendant's effort to assert sweeping privileges.  Accordingly, the Court should deny Defendant's Motion to Dismiss in its entirety and allow discovery to proceed.

## I.    PLAINTIFFS' CLAIMS ARE TIMELY

Because Plaintiffs presented their FTCA claims to the relevant federal agencies within less than two years of their reunification, Plaintiffs' claims are timely under 28 U.S.C. § 2401(b).  (*Cf.* Memorandum in Support of Defendant's Motion to Dismiss ("Mot.")[1].)  As the FTCA's time bars are not jurisdictional, a motion to dismiss challenging the timeliness of Plaintiffs' FTCA claims is properly considered under Rule 12(b)(6).  *See United States v. Wong*, 575 U.S. 402, 420 (2015).  Here, Plaintiffs adequately allege that by subjecting them to a prolonged separation lasting more than one year, Defendant's actions constituted a continuing violation that only ended when Plaintiffs were reunited in February 2019.  Alternatively, because any delay in filing Plaintiffs' claims resulted from the government's wrongful actions that are the subject of the Complaint, Plaintiffs are entitled to equitable tolling.

### A.    Plaintiffs Adequately Allege a Continuing Violation

Under federal claim accrual rules, which apply in FTCA cases, the statute of limitations does not begin running "any earlier than the last day of the ongoing injury."  *Alexander*, 721 F.3d at 425 (quoting *Devbrow v. Kalu*, 705 F.3d 765, 770 (7th Cir. 2013)).  The continuing violation

---

[1] Page numbers cited refer to the ECF page numbers in Defendant's as-filed Memorandum.

doctrine delays accrual when a tort is "continuing."  *Heard v. Sheahan*, 253 F.3d 316, 319 (7th Cir. 2001).  The doctrine applies when a "continuous series of events gives rise to a cumulative injury" and "it would be unreasonable to require or even permit [a plaintiff] to sue separately over every incident of the defendant's unlawful conduct."  *Id.* at 319-20.

An FTCA claim alleging either "a continuing wrong or [] a series of discrete, independently actionable harms, some of which occurred within the limitations period," is sufficient to withstand a motion to dismiss.  *See Alexander*, 721 F.3d at 425.  In *Alexander*, for example, the plaintiff alleged intentional infliction of emotional distress under the FTCA based on federal agents having framed him for bribery.  The plaintiff was acquitted of bribery charges in March 2009 and filed his FTCA claim with the FBI in October 2010.  *Id.* at 421.  The district court dismissed the claim as untimely, reasoning that the plaintiff should have known he had been framed when he was arrested in February 2008, or at the latest in July 2008, during one of the agent's depositions.  *Id.* at 425.  The Seventh Circuit reversed.  Because the plaintiff alleged "tortious conduct—which included witness intimidation, perjury, and suborning of perjury—continu[ing] right through [plaintiff's] trial," his IIED claim was timely.  *Id.*

As *Alexander* illustrates, the continuing violation doctrine applies where, as here, plaintiffs allege a "prolonged practice" of alleged wrongdoing.  *See also Sanders v. Moss*, 2023 WL 2164520, at *7 (C.D. Ill. Jan. 24, 2023) ("prolonged practice" of failing to afford prisoner due process constituted continuing violation).  But the "prolonged practice" need not include solely overt acts.  Rather, an ongoing refusal to take some action may constitute a continuing violation.

In *Heard*, for example, the Seventh Circuit applied the continuing violation doctrine to the defendants' alleged ongoing refusal to treat a prisoner's medical condition.  253 F.3d at 318.  The "refusal continued for as long as the defendants had the power to do something about his condition, which is to say until he left the jail."  *Id.*  "Every day that they prolonged his agony by not treating his painful condition marked a fresh infliction of punishment that caused the statute of limitations to start running anew."  *Id.*  The court distinguished the plaintiff's situation from one in which a plaintiff seeks backpay for daily acts of wage discrimination.  *Id.* at 320.  In the latter situation,

"the damages from each discrete act of discrimination would be readily calculable without waiting for the entire series of acts to end."  For the *Heard* plaintiff, it would have been "impractical to allocate the plaintiff's pain day by day across the period during which medical treatment was delayed" because each day that his pain was ignored, the plaintiff's pain increased. *Id.* at 319-20.

Similarly, in *Bodner v. Banque Paribas*, 114 F. Supp. 2d 117, 134-35 (E.D.N.Y. 2000), the continuing violation doctrine applied to defendants' ongoing refusal to return plaintiffs' property—allegedly misappropriated by Nazis and their accomplices in World War II—or to provide information relating thereto.  And in *Loumiet v. United States*, 968 F. Supp. 2d 142, 154-55 (D.D.C. 2013), the doctrine applied to an allegedly wrongful prosecution, on the theory that "[A] lawsuit is a continuous, not an isolated event, because its effects persist from the initial filing to the final disposition of the case. . . . A defendant subject to a lawsuit is likely to suffer damage not so much from the initial complaint but from the cumulative costs of defense and the reputational harm caused by an unresolved claim."  *Id.* (quoting *Whelan v. Abell*, 953 F.2d 663, 674 (D.C. Cir. 1992)).

Here, Plaintiffs were subject to a "numerous and continuous series of events" giving rise to one "cumulative injury."  *See Heard*, 253 F.3d at 319.  Plaintiffs allege that government employees forcibly separated them and then refused to take any action to reunite them, prolonging their separation for a period of over one year.  (Compl. ¶ 3; *see supra* at 5-8.)  The government's series of wrongful acts was undertaken specifically to advance a mandatory Family Separation Policy.  The alleged wrongdoing includes both overt actions and failures to act, as in *Heard* and *Bodner*.  The government first forcibly separated J.P. and M.A. using a false and unjustified criminal prosecution as pretext.  (Compl. ¶¶ 3, 35, 43-55, 162).  The government then detained J.P. for nearly five months, despite knowing that the criminal charges were a "mistake."  (*Id.* ¶¶ 61-79)  Throughout her detention, government employees ignored J.P.'s repeated requests to be reunited with her son—or even to know where her son was.  (*Id.* ¶¶ 64, 68, 70, 73-74, 77.)  Government officials then wrongfully deported J.P., unnecessarily prolonging her separation from M.A.  (*Id.* ¶¶ 72-76, 77, 79.)  Finally, despite a court-ordered obligation to do so, the government

failed to take any action to help reunite J.P. with her son, both during the time that J.P. was in Honduras and when she returned to the United States in February 2019.  (*Id.* ¶¶ 9, 39, 83-85; *see also supra* at 5-8.)  Because throughout this prolonged separation, the government maintained "the power to do something about" Plaintiffs' separation, the continuing violation only ended when Plaintiffs were reunited.  *See Heard*, 253 F.3d at 318.

Moreover, as in *Heard*, it would be unreasonable to require J.P. and M.A. to file a separate claim for each instance of the government's wrongdoing.  *See* 253 F.3d at 319-20.  Each day that Plaintiffs were subjected to prolonged separation "increased [their] pain."  *Id.* at 319.  Like the plaintiff in *Heard*, the damages from each discrete act by the government were not "readily calculable" until the continuing violation ended.  *Id.* at 320.  And like the harm caused by the frivolous lawsuit described in *Loumiet*, the "effects" of the government's separation of Plaintiffs persisted throughout the entire duration of the more than one year that they were apart.  *See Loumiet*, 968 F. Supp. 2d at 154-55.

At this early stage, Plaintiffs plausibly allege a continuing violation such that their claims did not accrue until their reunification on February 16, 2019.  *See Alexander*, 721 F.3d at 425.  Plaintiffs' claims were therefore timely.

### B.   Plaintiffs Are Entitled to Equitable Tolling

Plaintiffs' claims are also "subject to equitable tolling."  *Wong*, 575 U.S. at 410-12, 420-21.  Equitable tolling applies where the plaintiff establishes (1) that she diligently pursued her claim and (2) that some extraordinary circumstance prevented her from timely filing.  *Hill v. United States*, 180 F. Supp. 3d 578, 581 (S.D. Ill. 2016).  At the motion to dismiss stage, "the question is only whether there is *any* set of facts that if proven would establish a defense to the statute of limitations, and that possibility exists."  *Pedrote-Salinas v. Johnson*, 2018 WL 2320934, at *4 (N.D. Ill. May 22, 2018) (citation omitted, emphasis in original).

Equitable tolling is appropriate where, as here, there is a "causal link" between the defendant's wrongful action and the delay in filing.  *Hill*, 180 F. Supp. 3d at 583.  In *Hill*, equitable

12

tolling applied to the FTCA claims of a formerly incarcerated man who alleged that defendant's negligence caused him to lose his sight. *Id.* The justification for his filing delay was based on his "tumultuous living situation" (including struggling with housing and meeting his daily expenses) and his disability. *See id.* at 580, 583. The court held this justification sufficient for equitable tolling, emphasizing the "causal link between the defendant's conduct and the plaintiff's delay" in presenting his claims. *Id.* at 583.

At least one court has applied equitable tolling to a plaintiff's FTCA claims based on allegedly wrongful deportation. In *Avalos-Palma v. United States*, the plaintiff alleged that ICE wrongfully deported him to Guatemala "during the period in which the Government argue[d] that Plaintiff was required to bring his claims." 2014 WL 3524758, at *6-7 (D.N.J. July 16, 2014). The plaintiff returned to the United States in June 2012 and filed his administrative FTCA claim in March 2013. *Id.* The court analogized to cases in which plaintiffs were physically prevented from accessing a functioning court, explaining that bringing an FTCA claim outside the United States would have been an "extreme hardship[]" and that "Plaintiff would not have been able to effectively prosecute his claims while in Guatemala." *Id.*

Here, there is a "causal link" between the wrongful actions of Defendant's employees and any delay in Plaintiffs presenting their administrative claims. *Hill*, 180 F. Supp. at 583. Plaintiffs' claims arise from the government's forcible separation of mother and son and their prolonged separation for over one year pursuant to a mandatory Family Separation Policy. (Compl. ¶¶ 3, 35.) Acting in the furtherance of that policy, government officials coerced Plaintiff J.P. into abandoning her well-founded asylum claim and accepting deportation. (*Id.* ¶¶ 66-79.) Government officials deported Plaintiff J.P. on June 6, 2018, to a country where gang members had made credible threats on her life, and she was unable to leave her home due to her depression and fear of being killed. (*Id.* ¶¶ 43, 79, 81.) In Honduras, J.P. lived in constant fear of her persecutors. (*Id.* ¶ 81.) J.P. became so depressed that she contemplated suicide. (*Id.*)

Believing that the only way to see her son was to return to the United States, Plaintiff J.P. crossed the border on foot, exposing herself to grave danger. (*Id.* ¶ 82.) When she arrived in the

13

United States and presented herself at the port of entry, government employees mocked J.P., again subjected her to inhumane conditions of confinement, and again refused to take action to reunite her with her son. (*Id*. ¶¶ 83-85.) As soon as she was released, J.P. immediately went to find her son. (*Id*. ¶¶ 84-86.) Any delay in filing Plaintiffs' claims is thus attributable to the government.

To the extent that Defendant argues J.P. should have filed her and M.A.'s FTCA claims while in Honduras, that argument fails for the reasons discussed in *Avalos-Palma*. (*See also* Compl. ¶¶ 43, 79, 81.) Indeed, in *Ms. L*, Judge Sabraw recognized the extreme difficulty that parents like Plaintiff J.P. would have in accessing the U.S. justice system abroad. *See Ms. L*, 330 F.R.D. at 291 ("The ability of any such removed parents to pursue individual claims in this country would be virtually impossible.").

Finally, equitable tolling would not prejudice Defendant. In *Hill*, the court determined that the defendant would not be prejudiced because the plaintiff had filed an earlier iteration of his claim with the Bureau of Prisons shortly after his alleged injury, and so "the parties ha[d] the benefit of an administrative record." 180 F. Supp. at 582. Here, the parties have the benefit of the administrative records found in Plaintiffs' immigration files, some of which were obtained by Plaintiff J.P. pursuant to a FOIA request. (Compl. ¶ 70.) Moreover, Defendant's discovery obligations in the plethora of litigation regarding the Family Separation Policy (including *Ms. L*) indicate that it should have retained virtually all of the records relevant to this action.

Because the government is responsible for any delay in Plaintiffs' filing their administrative claims, Plaintiffs are entitled to equitable tolling.

## II. THE FTCA'S EXCEPTIONS DO NOT REQUIRE DISMISSAL OF PLAINTIFFS' CLAIMS

Defendant argues that Plaintiffs' claims should be dismissed based on three exceptions to the FTCA's waiver of sovereign immunity: the discretionary function exception ("DFE," found in 28 U.S.C. § 2680(a)), the due care exception (*id.*), and the independent contractor exception (*id.* § 2671). "The discretionary function exception applies only to conduct that involves the permissible exercise of policy judgment." *Berkovitz v. United States*, 486 U.S. 531, 539 (1988).

The due care exception applies to FTCA claims based on conduct undertaken by government employees, with due care, in implementing a statute or regulation. 28 U.S.C. § 2680(a). And the independent contractor exception applies to FTCA claims based on the conduct of a contractor who acted without the government's supervision or control. *See Corpeno-Argueta*, 341 F. Supp. 3d at 864.

Rule 12(b)(6) applies to Defendant's motion to dismiss based on these three exceptions. The Seventh Circuit has long held that "[t]he statutory exceptions enumerated in § 2680(a)-(n) to the United States's waiver of sovereign immunity (found in § 1346(b)) limit the breadth of the Government's waiver of sovereign immunity, but they do not accomplish this task by withdrawing subject-matter jurisdiction from the federal courts." *Reynolds v. United States*, 549 F.3d 1108, 1112 (7th Cir. 2008) (quoting *Parrott v. United States*, 536 F.3d 629, 634 (7th Cir. 2008)); *see also McCoy v. United States*, 731 F. App'x 524, 526 (7th Cir. 2018) (discussing the discretionary function exception as "a defense to liability, not a jurisdictional bar"). The Seventh Circuit's reasoning has been extended to the independent contractor exception in § 2671. *See, e.g.*, *Corpeno-Argueta*, 341 F. Supp. 3d at 863. Thus, a motion to dismiss based on one of the foregoing exceptions is properly considered under Rule 12(b)(6), not Rule 12(b)(1). *See Reynolds*, 549 F.3d at 1112.[2]

---

[2] Neither of the cases cited by Defendant supports its argument that recent Supreme Court decisions "strongly suggest" otherwise. (Mot. at 20, n.3.) Defendant's selective quoting from *Brownback* misses that what the Court referenced as "all elements of a meritorious claim" were the "six elements of § 1346(b)," the FTCA's jurisdiction-granting provision. *Brownback v. King*, 141 S. Ct. 740, 746, 749 (2021). *Brownback* did not address whether the FTCA's exceptions—located in a different section of Title 28 than the jurisdictional grant—are jurisdictional. For similar reasons, Defendant's argument based on *Wong* fails. *See Corpeno-Argueta*, 341 F. Supp. 3d at 862-63. "Because the Supreme Court has not addressed the precise issue before the Court," this Court should apply Seventh Circuit precedent and "treat the FTCA exceptions as claims-processing rules, not as jurisdictional bars." *See id.*

### A.       The Discretionary Function Exception Does Not Apply to Plaintiffs' Claims

Defendant cannot avoid liability by invoking the discretionary function exception.  Courts across the country have held that the DFE does not shield the government from liability for conduct taken in the furtherance of the Family Separation Policy.[3]

The DFE "is an affirmative defense, and to prevail on it, the government must establish two elements 'beyond reasonable dispute.'" *McCoy*, 731 F. App'x at 526 (quoting *Keller v. United States*, 771 F.3d 1021, 1023 (7th Cir. 2014)).  First, the challenged action must be discretionary, "involv[ing] an element of judgment or choice." *Berkovitz*, 486 U.S. at 536.  Second, the judgment or choice must be "of the kind that the [DFE] was designed to shield," meaning it is "based on considerations of public policy."  *Id.* at 537.  A motion to dismiss based on the discretionary function exception should be granted only if "the allegations of the complaint itself set forth everything necessary to satisfy the affirmative defense." *Corpeno-Argueta*, 341 F. Supp. 3d at 866 (quoting *Brooks v. Ross*, 578 F.3d 574, 579 (7th Cir. 2009)).

To determine whether a challenged action involved an element of judgment or choice under the first prong of the DFE analysis, the court "must first consider whether the action is a matter of choice for the acting employee."  *Berkovitz*, 486 U.S. at 536.  The DFE does not shield torts committed by government employees if those employees could exercise no judgment or choice in the implementation of a policy.  *See Palay v. United States*, 349 F.3d 418, 429-30 (7th Cir. 2003)

---

[3] *See B.Y.C.C. v. United States*, 2023 WL 5237174, at *6 (D.N.J. Aug. 15, 2023); *D.J.C.V. v. United States*, 605 F. Supp. 3d 571, 592–93 (S.D.N.Y. 2022); *A.P.F. v. United States*, 492 F. Supp. 3d 989, 996-97 (D. Ariz. 2020); *J.P. v. United States*, 2023 WL 4237331, at *8–9 (D. Ariz. June 28, 2023); *C.M. v. United States*, 2023 WL 3261612, at *43 (W.D. Tex. May 4, 2023); *C.D.A. v. United States*, 2023 WL 2666064, at *14–15 (E.D. Pa. Mar. 28, 2023); *D.A. v. United States*, 2023 WL 2619167, at *8–10 (W.D. Tex. Mar. 23, 2023); *I.T. v. United States*, No. 22-cv-05333 (N.D. Cal.), ECF No. 30 at 10–13; *K.O. v. United States*, 2023 WL 131411, at *9 (D. Mass. Jan. 9, 2023); *Fuentes-Ortega v. United States*, 2022 WL 16924223, at *3 (D. Ariz. Nov. 14, 2022); *E.C.B. v. United States*, No. CV-22-00915 (D. Ariz. Nov. 8, 2022), ECF No. 24 at 11–12; *E.S.M. v. United States*, 2022 WL 11729644, at *4–5 (D. Ariz. Oct. 20, 2022); *A.E.S.E. v. United States*, 2022 WL 4289930, at *9–13 (D.N.M. Sept. 16, 2022); *F.R. v. United States*, 2022 WL 2905040, at *5 (D. Ariz. July 22, 2022); *A.F.P. v. United States*, 2022 WL 2704570, at *12–14 (E.D. Cal. July 12, 2022); *Wilbur P.G. v. United States*, 2022 WL 3024319, at *4–5 (N.D. Cal. May 10, 2022); *Nunez Euceda v. United States*, 2021 WL 4895748, at *3 (C.D. Cal. Apr. 27, 2021); *A.I.I.L. v. Sessions*, 2022 WL 992543, at *3–4 (D. Ariz. Mar. 31, 2022); *C.M. v. United States*, 2020 WL 1698191, at *4 (D. Ariz. Mar. 30, 2020); *but see S.E.B.M. v. United States*, 2023 WL 2383784, at *14 (D.N.M. Mar. 6, 2023); *Peña Arita v. United States*, 470 F. Supp. 3d 663, 692 (S.D. Tex. 2020).

("[A] decisionmaker must be charged with making policy-related judgments in order for his choices to qualify for the discretionary function exception").

Under the second prong, courts have held that the DFE does not shield government officers' actions that arise from something other than legitimate policy considerations, such as inattentiveness, carelessness, or disregard for their job responsibilities or applicable regulations. *See, e.g.*, *Keller v. United States*, 771 F.3d 1021, 1025 (7th Cir. 2014) (government did not meet its burden to prove DFE applied where record permitted inference that government actions were based on inattentiveness rather than "grounded in public policy considerations"); *Palay*, 349 F.3d at 432 (noting that the DFE would not apply to claims arising from corrections officers' negligent or careless monitoring of a prison unit); *Ruiz v. United States*, 2014 WL 4662241, at *8 (E.D.N.Y. Sept. 18, 2014) (CBP officers' failure to adequately feed a four-year-old child and undue delay in contacting her parents as a result of negligence or laziness does not "constitute a considered judgment grounded in social, economic, or political policies."). In *Palay*, the Seventh Circuit reversed dismissal of a prisoner's negligent-reassignment claim and held that the DFE did not apply. Based on the allegations in the complaint, the court held that the plaintiff "may be able to show that the particular prison officials who transferred him into the holdover unit either lacked the authority to make the transfer and in that sense did not exercise protected discretionary judgment, or that they acted in direct contravention of BOP regulations in transferring Palay." 349 F.3d at 430-31. "Either way, their conduct would not be protected by the exception." *Id.* at 431.

Here, Plaintiffs allege that, pursuant to the mandatory Family Separation Policy, government officials forcibly separated them—using Plaintiff J.P.'s prosecution as a pretext—and kept them apart for over one year. In its attempt to invoke the DFE, Defendant argues that Plaintiffs were not separated pursuant to the Family Separation Policy but that the challenged actions were instead the result of discretionary determinations by federal officials. In view of the allegations in the Complaint, Defendant's arguments fail.

17

### 1.    Plaintiffs Were Separated Pursuant to the Family Separation Policy

Defendant first contends that Plaintiffs were not separated pursuant to the Family Separation Policy, suggesting that therefore their separation was discretionary, because they entered the United States before the Zero Tolerance Policy was publicly announced.  (Mot. at 9.)

As detailed above, numerous public records indicate that, although the Family Separation Policy was not publicly announced until April 2018, the policy was in fact in place as early as July 2017.  (*E.g.*, Compl. ¶¶ 19, 20, 22, 24, 25.)  Plaintiffs allege that the government concealed the Family Separation Policy from the public for almost a year and, when it was made public, attempted to minimize the scope of horrors that the government was perpetrating.  (*Id.* ¶ 32.)  These allegations plausibly demonstrate that J.P. and M.A's separation in January 2018 occurred under the Family Separation Policy.  Indeed, the court in *Ms. L* found "no dispute" that parents like J.P.— whose children were separated from them prior to April 2018 and released from ORR custody before the court's June 2018 preliminary injunction—were separated pursuant to the Family Separation Policy.  *Ms. L*, 330 F.R.D. at 289.

Defendant also argues that because J.P. was prosecuted for alien smuggling (8 U.S.C. § 1324) rather than illegal entry, Plaintiffs were not separated pursuant to the Family Separation Policy.  (Mot. at 9.)  But the Family Separation Policy was not limited to any one form of criminal prosecution.  As Plaintiffs allege, one of the building blocks of the Family Separation Policy was an April 2017 memorandum by the then-Attorney General, which specifically called for the prosecution of immigrants at the border under 8 U.S.C. § 1324.  (Compl. ¶ 19.)  Moreover, the purpose of the Family Separation Policy was to deter migrants from entering the United States (even to legally seek asylum) by making them fear separation from their children.  (*See id.* ¶ 33.)  Separating parent from child could be accomplished by charging the parent with any crime, not just illegal entry.

At this early stage, Plaintiffs need only allege facts that, if taken as true, plausibly indicate they were separated pursuant to the Family Separation Policy.  *See* Fed. R. Civ. P. 12(b)(6).  Plaintiffs have done so.  And because Plaintiffs allege that the Family Separation Policy mandated

that government officials prosecute J.P. and separate Plaintiffs, Defendant has not shown that the first prong of the DFE applies.

Even if Defendant had established that it had discretion to separate Plaintiffs, which it did not, Defendant fails to meet the second prong of the DFE by showing that its choice was "based on considerations of public policy." *Berkovitz*, 486 U.S. at 537. The "cruelty of the separation of a parent and child by the government" is only justified "in the most dreadful circumstances," such as when the parent is "unwilling or unfit" to care for the child—circumstances not present here. *D.J.C.V. v. U.S. Immigr. & Customs Enf't*, 2018 WL 10436675, at *1 (S.D.N.Y. Oct. 15, 2018); *see also Jacinto-Castanon de Nolasco v. U.S. Immigr. & Customs Enf't*, 319 F. Supp. 3d 491, 502 (D.D.C. 2018) ("nothing in federal law suggests that deterring immigration by indefinitely separating families once the parents have been transferred to immigration custody is a compelling or legitimate government objective").

### 2. Defendant Has Not Established That the DFE Applies to the Decision to Refer J.P. for Criminal Prosecution

Defendant also argues that government employees' decision to refer J.P. for criminal prosecution falls under the exception because it was an exercise of prosecutorial discretion. (Mot. at 17-18.) Plaintiffs do not dispute Defendant's assertion that the Attorney General and United States Attorneys generally have the discretion to enforce federal criminal laws. (*See id.*) Nor do Plaintiffs argue that CBP officers lack discretion to refer noncitizens for prosecution of a criminal offense. (*Id.*) Because the decision to prosecute is typically an exercise of discretion, "challenges to the quality of an investigation or prosecution are generally barred by the discretionary-function exception." *Reynolds*, 549 F.3d at 1113.

But as the Seventh Circuit explained in reversing the dismissal of an FTCA claim, law enforcement officers *do not* have discretion to provide knowingly false information to support a criminal prosecution. *Id.* ("[P]roviding knowingly false information en route to a criminal prosecution is 'sufficiently separable' from the 'protected discretionary decision.'"). Plaintiffs

19

plausibly allege that CBP officers knowingly fabricated false or misleading information to support a criminal charge against J.P. in order to justify Plaintiffs' separation. (Compl. ¶¶ 46-49 & n.50, 92, 117, 162.) Further, Plaintiffs plausibly allege that this action was undertaken pursuant to the Family Separation Policy, which *required* CBP officials to criminally prosecute migrants so that they would be separated from their children and thus deter future migrants from attempting to enter the United States. (*Id.* ¶¶ 19, 27, 35.) Courts in parallel cases have held that criminal prosecutions allegedly procured in furtherance of the Family Separation Policy did not involve any element of judgment or choice. *See, e.g.*, *B.Y.C.C.*, 2023 WL 5237147, at *6; *accord Palay*, 349 F.3d at 430-31. Thus, federal officials lacked discretion in their decision to criminally prosecute Plaintiff J.P. under the Family Separation Policy.

Defendant's cited cases are inapposite. Most did not involve FTCA claims, and merely recognized the general principle that the Attorney General has broad discretion to enforce federal criminal and immigration law.[4] Of the FTCA cases, none involved an allegation of unlawful conduct "sufficiently separable" from the "protected discretionary decision." *See Reynolds*, 549 F.3d at 1113; *Linder v. United States*, 937 F.3d 1087, 1090-91 (7th Cir. 2019) (holding that, although alleging a constitutional violation does not automatically render the DFE inapplicable or show the action did not involve "discretion," "a step 'sufficiently separable' from legitimate discretion can be actionable"). *Smith v. United States*, 375 F.2d 243, 247 (5th Cir. 1967) involved a claim based on the *failure* to prosecute, and thus struck at the heart of prosecutorial discretion. *Gen. Dynamics Corp. v. United States*, 139 F.3d 1280, 1282 (9th Cir. 1998) and *Blanco Ayala v. United States*, 982 F.3d 209, 216 (4th Cir. 2020) involved allegations that federal employees should have conducted their investigations more carefully, and were thus challenges to the "quality" of the investigation. *Reynolds*, 549 F.3d at 1113. Finally, in *S.E.B.M.*, the only unlawful conduct alleged by the plaintiff was a constitutional violation derivate of her father's prosecution.

---

[4] (Mot. at 25-26 (citing *United States v. Armstrong*, 517 U.S. 456 (1996); *In re Sealed Case*, 829 F.2d 50 (D.C. Cir. 1987); *Mejia-Mejia v. U.S. Immigr. & Customs Enf't*, 2019 WL 4707150 (D.D.C. Sept. 26, 2019); *Sw. Env't Ctr. v. Sessions*, 355 F. Supp. 3d 1121 (D.N.M. 2018); *United States v. Texas*, 143 S. Ct. 1964 (2023)).)

2023 WL 2383784, at *15.  And none of these cases involved a claim that an executive policy deprived government employees of their prosecutorial discretion, like Plaintiffs allege here.[5] Thus, Defendant has not established that government officials had the discretion to prosecute J.P. under the first prong of the DFE analysis.

Even if Defendant had demonstrated that its employees had discretion to prosecute J.P., Defendant fails to show that its choice was "of the kind that the [DFE] was designed to shield." *Berkovitz*, 486 U.S. at 537.  Procuring a prosecution based on knowingly false information is not the type of policy-making decision "that Congress sought to shield from 'second-guessing.'" *See Reynolds*, 549 F.3d at 1113-14 (citation omitted).  Indeed, the FTCA itself affords a remedy for "false imprisonment, false arrest, abuse of process, [and] malicious prosecution."  28 U.S.C. § 2680(h).

### 3.  Defendant Has Not Established That the DFE Applies to the Decision to Separate Plaintiffs

Defendant next argues that the government's decisions about where to detain J.P. and M.A. "were also discretionary and susceptible to policy analysis" and that this discretion included the decision to detain J.P. and M.A. in separate locations.  (Mot. at 26-27.)  In support, Defendant cites its statutory authority to "arrange for appropriate places of detention for [noncitizens] detained pending removal or a decision on removal," 8 U.S.C. § 1231(g)(1), and cases holding that decisions about whether and where to detain people are typically protected by the DFE.[6]  But Plaintiffs plausibly allege that their separation was undertaken pursuant to the mandatory Family Separation Policy, not the government's ordinary discretionary authority to determine whether and where to

---

[5] Although *S.E.B.M.* was a family separation case, the court did not address whether the Family Separation Policy deprived government employees of their prosecutorial discretion.  Rather, the plaintiff only argued that her father's prosecution violated the constitutional right to family integrity.  2023 WL 2383784, at *15.

[6] (Mot. at 27 (citing *Mirmehdi v. United States*, 662 F.3d 1073, 1081-82 (9th Cir. 2011); *Bailor v. Salvation Army*, 51 F.3d 678, 685 (7th Cir. 1995); *Lipsey v. United States*, 879 F.3d 249, 255 (7th Cir. 2018); *Cohen v. United States*, 151 F.3d 1338, 1342 (11th Cir. 1998); *Santana-Rosa v. United States*, 335 F.3d 39, 44 (1st Cir. 2003)).)

detain noncitizens.  Defendant's factual contentions cannot be resolved on a motion to dismiss.  *See Palay*, 349 F.3d at 430-31.

Defendant also contends that it had no legal obligation to keep parent and child together in view of J.P.'s criminal prosecution, arguing that neither the *Flores* Agreement (which "expresses an explicit policy favoring the release of minors to their parent or legal guardian," *Ruiz*, 2014 WL 4662241, at *7), nor the CBP's National Standards on Transport, Escort, Detention and Search ("TEDS") mandated the government to keep Plaintiffs together under these circumstances.  (Mot. at 27, 29-30.)  In support, Defendant cites the statute defining an unaccompanied minor, 6 U.S.C. § 279(g), a non-FTCA case recognizing that federal agencies have discretion to classify children as UACs,[7] and FTCA cases regarding the interpretation of a statute or policy.[8]

Defendant's arguments mischaracterize Plaintiffs' allegations.  Plaintiffs do not contend that it is inherently tortious for the United States to decide where to house detainees or to transfer custody of unaccompanied children in detention.  And even if Defendant is correct that it is not invariably required to keep a child with his or her parent when that parent is subject to criminal prosecution, this ignores Plaintiffs' allegations that:  (1) it did not have the discretion to bring false criminal charges against J.P. in the first place; and (2) the decision to separate Plaintiffs was mandated by the Family Separation Policy, and was thus not discretionary or susceptible to policy analysis at all.  2023 WL 131411, at *8.[9]  Plaintiffs are the "masters of the complaint" and can pursue the theory of liability they deem is best.  *Caterpillar Inc. v. Williams*, 482 U.S. 386, 396 (1987); *see also, e.g.*, *A.P.F.*, 492 F. Supp. 3d at 996-97 ("reject[ing] the United States' re-characterization of Plaintiffs' factual allegations as standalone claims").

---

[7] (Mot. at 28 (citing *D.B. v. Preston*, 119 F. Supp. 3d 472, 482-83 (E.D. Va. 2015)).)

[8] (Mot. at 28-30.)  Defendant also cites the general proposition that the DFE protects decisions that "necessarily reflect[] the decisionmaker's judgment that it is more desirable to make" one decision over another.  (*See* Mot. at 28-29 (quoting *Fisher Bros. Sales, Inc. v. United States*, 46 F.3d 279, 287 (3d Cir. 1995)).)

[9] Defendant cites a single case holding that decisions by DHS to separate family members were protected by the DFE.  (Mot. at 27 (citing *Peña Arita*, 470 F. Supp. 3d at 691-92.)  But that case did not consider allegations that government officials lacked discretion to prosecute based on false information, which Plaintiffs allege triggered their separation here.  Moreover, that decision is against the weight of authority.  *See D.A.*, 2023 WL 2619167, at *10 n.130 (collecting cases).

Finally, even if the DFE were to apply to the government's *initial* decision to separate Plaintiffs, it would not bar Plaintiffs' claims based on their prolonged separation after J.P.'s criminal charges were dismissed.  Plaintiffs allege that "[t]he government implemented the family separation policy" in violation of the FSA's requirement to "'make and record . . . prompt and continuous efforts . . . toward family reunification[.]'"  (Compl. ¶ 110 (quoting FSA ¶ 18).)  The government's continuing refusal to take any action to reunite Plaintiffs—in part due to its failure to adequately track parent-child relationships—violated FSA ¶ 18.  *See A.E.S.E.*, 2022 WL 4289930, at *13 (finding similar allegations sufficient to overcome the government's DFE argument).  Defendant's Motion fails to address this allegation.

### 4.    Defendant Has Not Established That the DFE Applies to the Decisions to Subject Them to Intolerable Conditions of Confinement

Finally, Defendant argues that the DFE bars Plaintiffs' claims regarding the conditions of their confinement.  (Mot. at 31-32.)  Defendant argues that decisions regarding conditions of confinement are generally discretionary, but fails to address or distinguish the various, specific provisions of mandatory policy that Plaintiffs allege applied to their conditions of confinement. Defendant fails to address Plaintiffs' allegations that government employees violated TEDS by subjecting Plaintiffs to intolerably cold conditions (Compl. ¶¶ 120, 122), by failing to provide M.A. with hot meals (*id.* ¶¶ 120, 123), and by their gratuitous acts of cruelty toward J.P. and M.A. (*id.* ¶¶ 125-128).  Other courts have rejected Defendant's DFE defense at the motion to dismiss stage based on similar alleged facts.  *See, e.g.*, *D.A.*, 2023 WL 2619167, at *12 (detention in frigid conditions likely violated TEDS); *Ruiz*, 2014 WL 4662241, at *8 (first prong of DFE did not apply because officers failed to follow Flores Agreement and CBP policies); *see also A.E.S.E.*, 2022 WL 4289930, at *11 (in family separation case, "[i]t was not within the officers' discretion to deny Plaintiffs . . . basic requirements in light of the TEDS Standards and Flores Agreement").

Defendant states that the provision cited by Plaintiffs, the Short-Term Custody Policy,[10] does not apply to Plaintiffs' custody at the port of entry, "which is run by the CBP OFO [Office of Field Operations]," another sub-entity of CBP.  But the Short-Term Custody Policy itself states that it applies to persons "detained in hold rooms at Border Patrol stations, checkpoints, processing facilities, *and other facilities that are under the control of U.S. Customs and Border Protection* (CBP)."  *Id.* at 1.  Moreover, Defendant fails to address the Short-Term Detention Standards and Oversight Report cited by Plaintiffs, which similarly describes CBP's "standards of custody" without separating OFO out from any other CBP sub-entity.[11]  Thus, Defendant has not shown that the DFE applies to CBP's decisions to hold Plaintiffs in conditions that failed to "provide for their well being and general good health," including by denying Plaintiffs access to a restroom and failing to provide Plaintiffs with drinking water.  (Compl. ¶¶ 120-121, 123.)

Defendant also ignores Plaintiffs' allegations that government employees violated the *Flores* Agreement with respect to the gratuitous acts of cruelty against M.A. and the conditions in which M.A. was held.  (Compl. ¶¶ 108-109.)  Defendant mentions the *Flores* Agreement only in its parenthetical to *S.E.B.M.*, 2023 WL 2383784, at *16, where Defendant quotes:  "The *Flores* Agreement provides no time parameters for how long or frequent calls between children and their family members should be."  (Mot. at 31-32.)  But the cited portion of the *S.E.B.M.* court's ruling addressed the due care exception, *not* the discretionary function exception.  Moreover, that sentence fails to show how the government's decision to limit communication between J.P. and M.A. was "susceptible to policy analysis" under the second prong of the DFE test.  Plaintiffs allege that they were denied communication in the furtherance of a policy meant to terrorize people like Plaintiffs for the purpose of deterrence.  Because "[t]hat is not a valid priority" in line with the

---

[10] (Compl. ¶ 53, n.51 (citing *Memorandum from David V. Aguilar, Chief, U.S. Border Patrol, to All Chief Patrol Agents*, U.S. CUSTOMS & BORDER PROT. (Jun. 2, 2008), https://nomoredeaths.org/wp-content/uploads/2014/10/Hold-Rooms-Short-Term-Custody-Policy.pdf).)

[11] (Compl. ¶ 113, n.72 (citing *Short-Term Detention Standards and Oversight, Fiscal Year 2015 Report to Congress*, U.S. DEP'T OF HOMELAND SEC., U.S. CUSTOMS AND BORDER PROTECT. (Dec. 8, 2015), https://www.cbp.gov/sites/default/files/assets/documents/2022-Jan/Short-Term%20Detention%20Standards%20and%20Oversight_1.pdf).)

*Flores* Agreement, the DFE does not insulate Defendant from liability for that conduct.  *See K.O.*, 2023 WL 131411, at *8.[12]

**B.      The Due Care Exception Does Not Apply to Plaintiffs' Claims**

Defendant argues that the due care exception bars Plaintiffs' claims.  (Mot. at 32-34.)  Like the DFE, the due care exception is an affirmative defense.  *See Bunch v. United States*, 880 F.3d 938, 941-42 (7th Cir. 2018).

**1.      The *Welch* Test—Not *Dupree*—Is the Proper Test for the Due Care Exception**

Defendant argues that the due care exception applies where government employees "act pursuant to and in furtherance of regulations," relying on an outdated test from *Dupree v. United States*, 247 F.2d 819, 824 (3d Cir. 1957).  (Mot. at 32.)  The Seventh Circuit has not adopted its own test for the due care exception.  This Court should follow the lead of district courts in nearly every other circuit and apply the Fourth Circuit's test formulated in *Welch v. United States*, 409 F.3d 646, 652 (4th Cir. 2005).[13]

*Welch* set forth a two-step test for determining whether the due care exception applies.  The first step is to ask "whether the statute or regulation in question specifically pr[e]scribes a course of action for an officer to follow."  *Welch*, 409 F.3d at 652.  "[I]f a specific action is mandated," then the court proceeds to the next question, "whether the officer exercised due care in following the dictates of that statute or regulation."  *Id.*  "If due care was exercised, sovereign immunity has not been waived."  *Id.*  As explained below, Defendant fails the first step of the due care analysis.  Even if this Court reaches the second question, Defendant fails there, too.

---

[12] Defendant also wholly ignores Plaintiffs' allegations that the failure to facilitate contact between them violated the binding standards that govern ICE under the Performance-Based National Detention Standards ("PBNDS").  (Compl. ¶¶ 129-135.)  That alone provides an independent basis to conclude that Defendant has not met its burden in establishing that the DFE applies to its employees' decisions to deny communication between Plaintiffs.

[13] *See, e.g.*, *K.O.*, 2023 WL 131411, at *6; *D.J.C.V.*, 605 F. Supp. 3d at 589; *C.D.A.*, 2023 WL 2666064, at *15; *D.A.*, 2023 WL 2619167, at *5; *Moher v. United States*, 875 F. Supp. 2d 739, 763–64 (W.D. Mich. 2012); *A.F.P.*, 2022 WL 2704570, at *14–15; *A.E.S.E.*, 2022 WL 4289930, at *13; *Lyttle v. United States*, 867 F. Supp. 2d 1256, 1299 (M.D. Ga. 2012); *Alvarez-Portillo v. United States*, 2005 WL 2898024, at *3 (W.D. Mo. Nov. 1, 2005).

### 2.    No Statute or Regulation Prescribed the Course of Action
### Government Officials Took Toward J.P. and M.A.

Defendant has failed to identify any statute or regulation that specifically prescribes a course of action for an officer to follow with respect to the vast majority of conduct alleged in the complaint.  Defendant cites only one statute, 8 U.S.C. § 1232(b)(3), which it argues "required" the transfer of M.A. to the care of ORR.  (Mot. at 33.)  8 U.S.C. § 1232(b)(3), part of the William Wilberforce Trafficking Victims Protection Reauthorization Act of 2008 ("TVPRA"), states that "any department or agency of the Federal Government that has an unaccompanied alien child in custody shall transfer the custody of such child to the Secretary of Health and Human Services not later than 72 hours after determining that such child is [a UAC]."  Defendant's attempt to bar Plaintiffs' claims on the basis of this statute fails.

Defendant's argument puts the cart before the horse.  8 U.S.C. § 1232(b)(3) sets a deadline for transfer.  It does not mandate any of the actions that trigger the transfer obligation, such as the decision to prosecute parents and separate minor children from their parents.  Indeed, "the government cannot hide behind the [due care exception] when it triggers a statutory scheme with conduct not mandated by the statute."  *K.O.*, 2023 WL 131411, at *6; *see also id.* ("the children were *already separated* before the TVPRA became relevant" (emphasis in original)).

Plaintiffs allege that CBP employees procured the prosecution of J.P. based on false information, to manufacture the need to separate her from her ten-year-old son.  (Compl. ¶¶ 46-49 & n.50, 162.)  Defendant does not argue that the TVPRA—or any other statute or regulation— mandated those alleged actions.  *See C.D.A.*, 2023 WL 2666064, at *15 (determining children "were unaccompanied only because of the Government's fulfillment of its zero-tolerance policy by detaining" their parents); *K.O.*, 2023 WL 13144, at *6.  Moreover, nothing in the TVPRA mandates that the government deny a parent information about her child's whereabouts.  *See K.O.*, 2023 WL 13144, at *6 ("nothing in the TVPRA forbids communication or the relay of accurate

26

information about a parent's whereabouts to a child."). Thus, the due care exception does not bar Plaintiffs' claims.[14]

### 3. Government Officials Did Not Exercise Due Care

Defendant does not advance any argument that officials exercised due care in carrying out any of the conduct alleged in the Complaint. For this reason, even if Defendant has satisfied the first step of *Welch*, it has not met its burden on the second step. "'Due care' implies at least some minimal concern for the rights of others." *Hatahley v. United States*, 351 U.S. 173, 181 (1956). Plaintiffs plausibly allege that government officials took actions that lacked even minimal concern for J.P.'s rights, such as telling M.A. that J.P. was not his mother, that he would "never" see his mother again, and preventing M.A. from speaking with his mother. (Compl. ¶¶ 47, 57, 60.) Plaintiffs plausibly allege that Defendant's employees likewise failed to exercise due care by taunting J.P., refusing to provide J.P. with any information about her son's whereabouts, and preventing her from communicating with him once she figured out where he was located. (*Id.* ¶¶ 63, 68, 70, 83.) Moreover, Plaintiffs allege that the government mistreated them for the purpose of deterring asylum seekers like them from seeking safety in the United States. (*Id.* ¶¶ 28, 33, 42, 101.) Thus, Defendant cannot satisfy the second step of the *Welch* test, and the due care exception is inapplicable.

### C. The Independent Contractor Exception Does Not Apply to Plaintiffs' Claims

Defendant argues that "[t]he independent contractor exception bars Plaintiffs' claims to the extent they are based on M.A.'s transfer to a shelter in Arizona where he was allegedly bullied and suffered a split lip." (Mot. at 36.) Courts to consider the independent contractor exception in this context have found it inapplicable where, as here, the plaintiffs allege harm traceable to the acts of U.S. government officials in implementing an executive policy. *See, e.g.*, *A.P.F.*, 492 F. Supp. 3d at 998; *A.F.P.*, 2022 WL 2704570, at *18; *Flores Benitez v. Miller*, 2023 WL 5290855, at *16 (D. Conn. Aug. 17, 2023) (declining to apply independent contractor exception where the harms

---

[14] The Family Separation Policy was not a "statute or regulation"; it was an executive policy, which is not covered by the due care exception. *See A.E.S.E.*, 2022 WL 4289930, at *14 (quoting *A.F.P.*, 2022 WL 2704570, at *15).

suffered by the plaintiffs were "directly and proximately cause[d] by the Government's forcible separation of parent and child").  Plaintiffs' claims arise not from the fact that M.A. was bullied and injured while in the shelter, but from the government's policy resulting in government agents' forcible and prolonged separation of a mother and son.  The harm that M.A. suffered in the shelter would not have occurred had the government not needlessly separated J.P. and M.A., which in turn allowed the government to manufacture the need to transfer M.A. to the shelter.  Thus, the independent contractor exception does not bar Plaintiffs' claims.

## III.    THE GOVERNMENT'S TORTIOUS ACTS HAVE A PRIVATE ANALOG

Defendant moves to dismiss Plaintiffs' complaint on the ground that "the challenged government actions have no private-person analog[]." (Mot. at 34.)[15]  Numerous courts reviewing child separation cases asserting Texas state law torts have considered and properly rejected this argument.[16]  This Court should do the same.

The FTCA makes the United States liable "in the same manner and to the same extent as a private individual under *like circumstances*." 28 U.S.C. § 2674 (emphasis added).  Defendant does not even mention the state torts Plaintiffs pled, let alone analyze whether they are based on "like circumstances."  Instead, Defendant makes the sweeping assertion that because prosecution and detention determinations are determinations that no private actor is empowered to make, no private analog can exist.  (Mot. at 34-35.)  But as the Supreme Court has explained, the words "'like circumstances' do not restrict a court's inquiry to the *same circumstances*, but require it to look further afield."  *United States v. Olson*, 546 U.S. 43, 46-47 (2005) (emphasis in original).  Thus, the fact that challenged actions may involve "uniquely governmental functions" does not preclude finding a private person analog.  *Id.* at 47-48 (explaining that "Courts of Appeals have found ready

---

[15] Because the private-person analog appears in the jurisdiction-granting provision of the FTCA, 28 U.S.C. § 1346, this is Defendant's only basis for seeking dismissal pursuant to Rule 12(b)(1).  *See Brownback*, 141 S. Ct. at 746.

[16] *See, e.g.*, *D.A.*, 2023 WL 2619167, at *10 (finding a private analog for claims based on forcible separation); *K.O.*, 2023 WL 131411, at *11–12 (finding private analogs for IIED, child abduction, false imprisonment, and loss of consortium); *A.F.P.*, 2022 WL 2704570, at *10 (finding private analogs for negligence, IIED, and abuse of process); *A.E.S.E.*, 2022 WL 4289930, at *14 (finding private analog for IIED).

private person analogies for Government tasks" such as inspection of cattle, automobile titles, mines, and airplanes); *see also Indian Towing Co. v. United States*, 350 U.S. 61, 64-65 (1955) (finding allegations that the Coast Guard failed to properly operate lighthouse to be analogous to allegations of negligence, even though private individuals do not operate lighthouses); *Liranzo v. United States*, 690 F.3d 78, 94 (2d Cir. 2012) ("To say that the challenged action is one that only the federal government does in fact perform does not necessarily mean that no private analog[ ] exists.").

A private analog exists under Texas law for each of Plaintiffs' claims. Texas recognizes IIED claims, *Twyman v. Twyman*, 855 S.W.2d 619, 621-24 (Tex. 1993), and a cause of action for child abduction that allows a parent deprived of custody to seek damages for severe mental anguish without physical injury. *Silcott v. Oglesby*, 721 S.W.2d 290, 292 (Tex. 1986). Texas courts permit negligence claims against private individuals responsible for the custody of others, such as the employees at a private facility for the mentally impaired. *Salazar v. Collins*, 255 S.W.3d 191, 198 (Tex. App. 2008). Further, Texas recognizes an abuse of process claim where a private person, as well as a government employee, engages in "the malicious use or misapplication of process in order to accomplish an ulterior purpose." *Hunt v. Baldwin*, 68 S.W.3d 117, 129 (Tex. App. 2001); *see also Cooper v. Trent*, 551 S.W.3d 325, 333-34 (Tex. App. 2018). Similarly, Texas recognizes a cause of action against private persons for malicious prosecution. *Thrift v. Hubbard*, 974 S.W.2d 70, 80 (Tex. App. 1998). And Texas law imposes liability on private persons for false imprisonment. *Wal-Mart Stores, Inc. v. Rodriguez*, 92 S.W.3d 502, 506 (Tex. 2002). Finally, Texas allows a child to recover for loss of consortium when a third party causes "serious" injuries to his parent. *Reagan v. Vaughn*, 804 S.W.2d 463, 467 (Tex. 1990).

Defendant's cited cases are not to the contrary. Defendant cites cases considering challenges to the denial or withdrawal of an immigration status or benefit (*e.g.*, denial of status

adjustment application, naturalization application, or withdrawal of citizenship).[17]  But Plaintiffs are not challenging decisions on their eligibility for immigration status, "which only the federal government is capable of altering."  *Liranzo*, 690 F.3d at 96.[18]  Rather, Plaintiffs allege that they were injured while in the custody of immigration officials, a circumstance none of the cases cited by Defendant addresses.  In fact, courts have repeatedly found private state analogs for tortious conduct by immigration officials.[19]  For these reasons, other family separation cases have rejected the argument that the challenged government conduct has no private person analog.[20]

Plaintiffs have thus satisfied the jurisdictional requirement of showing that a private analog exists for each of their tort claims under Texas law.  *See* 28 U.S.C. § 1346(b).

## IV.   PLAINTIFFS ADEQUATELY STATE CLAIMS FOR RELIEF UNDER TEXAS LAW

### A.   Defendant Cannot Claim Sweeping Privilege Under Texas Law

Defendant contends that all of the conduct challenged by Plaintiffs was privileged under Texas law, relying on the truism that "[a]ctions that may otherwise subject a person to liability are not tortious if the conduct is privileged."  (Mot. at 37 (citing *Hinojosa v. City of Terrell*, Tex. 834 F.2d 1223, 1231 (5th Cir. 1988).)  Defendant fails to cite any Texas statute that would privilege its actions, instead broadly claiming that it is protected by prosecutorial privilege and detention privilege.

---

[17] (Mot. at 35 (citing *Bhuiyan v. United States*, 772 F. App'x 564 (9th Cir. 2019); *Elgamal v. Bernacke*, 714 F. App'x 741 (9th Cir. 2018); *Elgamal v. United States*, 2015 WL 13648070 (D. Ariz. July 8, 2015); *Mazur v. United States*, 957 F. Supp. 1041 (N.D. Ill. 1997)).)

[18] Defendant's other citations are similarly inapplicable.  (Mot. at 35.)  *Sea Air Shuttle Corp. v. United States*, 112 F.3d 532, 537 (1st Cir. 2020) held the failure to take enforcement action against a third party did not give rise to an enforceable duty to an individual victim of the third party's conduct.  And *Ryan v. Immigr. & Customs Enf't*, 974 F.3d 9 (1st Cir. 2020) had nothing to do with the FTCA or the private person analog.

[19] *See, e.g.*, *Avalos-Palma v. United States*, 2014 WL 3524758, at *12 (D.N.J. July 16, 2014) (private analog doctrine did not bar claims arising from wrongful deportation); *Lyttle v. United States*, 867 F. Supp. 2d 1256, 1300–01 (M.D. Ga. Mar. 31, 2012) (negligence claim for arrest and confinement and negligent infliction of emotional distress against ICE officers cognizable under state law); *Roe v. United States*, 2019 WL 1227940, at *5–6 (S.D.N.Y. Mar. 15, 2019) (negligence and intentional and negligent infliction of emotional distress claims based on disregard of statutory duty viable under New York law against immigration officials).

[20] *See, e.g.*, *B.Y.C.C.*, 2023 WL 5237147, at *7; *C.D.A.*, 2023 WL 2666064 at *16; *D.A.*, 2023 WL 2619167, at *10.

First, the text of the FTCA forecloses a generalized immunity for immigration law enforcement. 28 U.S.C. § 2680(h) specifies that law enforcement officers are not exempt from liability for "assault, battery, false imprisonment, false arrest, abuse of process, or malicious prosecution." "For the purpose of this subsection, 'investigative or law enforcement officer' means any officer of the United States who is empowered by law to execute searches, to seize evidence, or to make arrests for violations of Federal law." *Id.* The statute thus contemplates that *federal officials*, some of whom are "investigative or law enforcement officers," are liable for tortious conduct. *Id.* Federal immigration authorities vested with arrest power arrested and detained Plaintiff J.P. for a (manufactured) violation of federal law. The statute expressly allows suits in this context, and Defendant cannot claim a generalized privilege merely because of the nature of immigration law enforcement.

Accordingly, numerous district courts have allowed FTCA claims to proceed despite the governmental nature of immigration enforcement. *C.D.A.*, 2023 WL 2666064, at *22 (finding no privilege under Texas law from the claims brought by separated families); *Fuentes-Ortega*, 2022 WL 16924223, at *4–5 (rejecting the government's argument that the uniquely federal function of immigration enforcement forecloses government liability under FTCA); *C.M.*, 2020 WL 1698191, at *2 (same); *D.J.C.V.*, 605 F. Supp. 3d at 599 (same); *cf. Olson*, 546 U.S. at 46 (United States may be liable for negligent performance of uniquely governmental functions). To be sure, in the outlier case *S.E.B.M.*, the court held that the government was privileged from liability for an IIED claim under New Mexico law. 2023 WL 2383784, at *8. Importantly, however, that case recognized that if a government's conduct is contrary to federal law, the government would not be protected. *Id.* Here, Defendant does not allege any Texas privilege similar to the New Mexico privilege in *S.E.B.M.*, and Plaintiffs plausibly allege that the government's conduct was unlawful under federal law. (*See* Compl. ¶¶ 88-135.)

Second, no case law supports Defendant's request for blanket prosecutorial immunity. *Hinojosa* held that a police officer was not liable for assault under Texas law for drawing a weapon at someone in "'necessary' situations," such as the arrest of a suspect. *Hinojosa*, 834 F.2d at 1231–

31

32.  *McElroy v. United States* evaluated officers' claims of qualified immunity, not privilege. 861 F. Supp. 585, 595 (W.D. Tex. 1994).  Other cases cited by Defendant address only whether a specific Texas privilege statute applies in circumstances not present here.[21]

Third, *Caban v. United States*, 728 F.2d 68 (2d Cir. 1984) does not support Defendant's argument for a detention privilege.  *Caban* held that New York law shielded Immigrant and Naturalization Service agents from liability for a six-day immigration detention because the initial detention was lawful and the six-day duration was "not unreasonably long" given administrative constraints.  *See id.* at 75; *Nguyen v. United States*, 2001 WL 637573, at *9 (N.D. Tex. June 5, 2001) ("*Caban* indicates that a lawful detention can become unlawful at the point at which the INS's decision to continue the detention is no longer reasonable."), *aff'd*, 65 F. App'x 509 (5th Cir. 2003).  By contrast, Plaintiffs plausibly allege that the government's conduct was unreasonable—it forcibly separated Plaintiffs, kept them apart for an unreasonable duration, and subjected them to inhumane treatment.[22]  Thus, Defendant's claim to sweeping privilege under Texas law fails.

**B.      Plaintiffs State a Claim for Intentional Infliction of Emotional Distress**

Defendant argues that Plaintiffs fail to state an IIED claim because their "separation [was] a necessary consequence of [J.P.'s] criminal charges" and therefore does not constitute outrageous behavior.  (Mot. at 40.)  In support, Defendant contends that "the Grand Jury found probable cause to indict Plaintiff J.P."  *Id.*  Finally, Defendant argues that Plaintiffs' allegations of "threats and insults made by various guards" fail to state a claim, because they are "mere insults, indignities, [or] threats."  (*Id.* at 41 (citation omitted).)

---

[21] *Villafranca v. United States*, 587 F.3d 257, 264-65 (5th Cir. 2009) (holding that Texas civil privilege statute privileges the conduct of DEA officers while effectuating an arrest); *Davila v. United States*, 713 F.3d 248, 261 (5th Cir. 2013) (same); *Hernandez v. United States*, 2018 WL 4103015, at *3-4 (S.D. Tex. July 2, 2018) (holding that a Texas statute specifically privileged negligent conduct by an "operator of an authorized emergency vehicle," but not reckless conduct).

[22] Even if this Court finds *Caban* persuasive, its holding was unique to false imprisonment, and thus would not extend to Plaintiffs' other tort claims.  *See Caban*, 728 F.2d at 72.

As a preliminary matter, Defendant's reliance on the indictment is improper.  *Alexander*, discussed above, involved a similar situation.  The plaintiff alleged an FTCA malicious prosecution claim under Indiana law.  721 F.3d at 422.  One of the elements of the claim was that "the defendant had no probable cause to institute the action."  *Id.*  The district court dismissed the claim on the ground that the plaintiff had insufficiently pleaded the "probable cause" element.  *Id.* at 423.  The Seventh Circuit reversed, explaining that "the court asked too much of Alexander" on a motion to dismiss.  *Id.*  The complaint adequately pleaded the absence of probable cause, because it alleged that the affidavit that served as the basis for the plaintiff's arrest and prosecution "was based on fabricated evidence and excluded evidence that favored Alexander."  *Id.* at 423. Importantly, the court noted that "[a]lthough the district court may have assumed that there was other, non-tainted evidence against Alexander, such an assumption is not supported by anything *in the complaint*."  *Id.* (emphasis added).  Plaintiffs here similarly allege that J.P.'s criminal prosecution was not supported by probable cause.  (*See* Compl. ¶ 49 & n.50.)

Regardless, Defendant's argument also fails because it is premised on an incorrectly narrow view of Plaintiffs' IIED claim.  Plaintiffs assert not only improper prosecution and threats and insults by guards, but more broadly that Defendant's prosecution of J.P. "was a pretextual means of cruelly separating her from her children and keeping them separated" to deter asylum seekers like Plaintiffs from seeking safety in the United States.  *See D.A.*, 2023 WL 2619167, at *16 (holding that the plaintiffs stated a plausible claim for IIED and rejecting the government's argument that the separation was predicated on [the mother's] incarceration and therefore could not be extreme or outrageous); *see also C.D.A.*, 2023 WL 2666064, at *22 (allowing Texas IIED claim to proceed in family separation case because a reasonable person could find the government's conduct "extreme and outrageous").

As in *D.A.*, Plaintiffs' IIED claim is based on Defendant's employees' cumulatively cruel treatment of Plaintiffs while in the government's custody.  (*E.g.,* Compl. ¶¶ 50-55, 60-64, 67-70, 78-79, 83-84, 140.)  Part of the treatment to which Plaintiffs were subjected included verbal abuse (*see id.* ¶¶ 47-48, 54, 57, 63, 83-84), but the IIED claim is not based solely on those instances.  (*Cf.*

Mot. at 41.)  Even if it were, the claim would not be barred because the alleged abuse far surpasses "mere insults, indignities, threats," *Ugalde v. W.A. McKenzie Asphalt Co.*, 990 F.2d 239, 243 (5th Cir. 1993), or occasions where "someone's feelings [were] hurt," *Wilson v. Monarch Paper Co.*, 939 F.2d 1138, 1143 (5th Cir. 1991).  Plaintiffs plausibly allege that they continue to suffer from the painful ramifications of their experiences in government custody to this day.  (*Id.* ¶¶ 136-138.)

### C.    Plaintiffs State a Claim for Negligence

Defendant mischaracterizes Plaintiffs' negligence claim as a claim for negligent infliction of emotional distress.  (Mot. at 41.)  Plaintiffs do not plead a claim for negligent infliction of emotional distress.

Defendant also argues that "no [] duty existed" to keep Plaintiffs together.  (*Id.* at 41-42.) But Plaintiffs do not allege that the government was negligent merely because it separated Plaintiffs.  Rather, Plaintiffs allege that the *manner* in which the government separated Plaintiffs and prolonged their separation for over one year was negligent.  (Compl. ¶¶ 145, 148.)  Under Texas law, "a duty arose when CBP officers took Plaintiffs into custody and assumed control over them." *B.Y.C.C.*, 2023 WL 5237147, at *12.  "Texas courts have imposed duties of care on individuals and entities that assume custody and control of others." *Id.* (citing *Applebaum v. Nemon*, 678 S.W.2d 533, 535-36 (Tex. App. 1984) and *Helbing v. Hunt*, 402 S.W.3d 699, 705 (Tex. App. 2012)).  Plaintiffs plausibly allege that Defendant violated that duty of care through the manner and duration of their separation.

### D.    Plaintiffs State a Claim for Abuse of Process

Defendant argues that Plaintiffs have not met the first element of an abuse of process claim under Texas law, which requires a plaintiff to show "the defendant made an illegal, improper, or perverted use of the process, a use neither warranted nor authorized by the process[.]" *Hunt v. Baldwin*, 68 S.W.3d 117, 129 (Tex. App. 2001) (citation omitted).  Defendant contends that, because all Plaintiffs allege is that "the process was used to pursue criminal and removal proceedings against a noncitizen who was suspected of 'noncitizen' smuggling," they have not

met the first element of the claim.  (Mot. at 42-43.)  But as Defendant appears to recognize, Texas law provides for an abuse of process claim where "the original issuance of a legal process is justified, but the process itself is subsequently used for a purpose for which it was not intended." *Hunt*, 68 S.W.3d at 130.  That is precisely what Plaintiffs allege here.  Plaintiffs allege that the decision to prosecute J.P. for alien smuggling was a pretext for forcibly separating mother and child.  (Compl. ¶¶ 153-54.)  Plaintiffs further allege that the prosecution and separation were part of a deliberate effort to deter asylum seekers like Plaintiffs from seeking safety in the United States. (*Id.* ¶¶ 28, 33, 35, 42.)  Other courts to consider family separation cases have found such allegations sufficient to meet the first element of an abuse of process claim under Texas law.  *See B.Y.C.C.*, 2023 WL 5237147, at *15; *D.A.*, 2023 WL 2619167, at *17.

### E.   Plaintiffs State a Claim for Malicious Prosecution

Defendant argues that Plaintiff J.P. cannot state a claim for malicious prosecution "because probable cause existed to commence prosecution against her."  (Mot. at 43.)  In support, Defendant again cites the indictment against J.P.  (*Id.* at 44.)  Defendant's factual dispute on the issue of probable cause cannot be resolved on a motion to dismiss.  *See Alexander*, 721 F.3d at 423.

Defendant correctly notes that, to prevail in a malicious prosecution claim, the plaintiff must rebut the presumption "that the defendant acted reasonably and had probable cause to initiate criminal proceedings."  *Summerville v. Allied Barton Sec. Servs.*, 248 S.W.3d 333, 337–38 (Tex. App. 2007).  "Whether probable cause is a question of law or a mixed question of law and fact depends on whether the parties dispute the underlying facts.  *When the facts underlying the defendant's decision to prosecute are disputed, the trier of fact must weigh evidence* and resolve conflicts to determine if probable cause exists, as a mixed question of law and fact."  *Richey v. Brookshire Grocery Co.*, 952 S.W.2d 515, 518 (Tex. 1997) (emphasis added) (citation omitted).

Here, Plaintiffs adequately allege that government employees lacked probable cause to prosecute and arrest J.P.  Plaintiffs allege that J.P. presented herself at the port of entry with her son, truthfully told CBP that they did not have documents to enter the United States and were seeking asylum, and presented proof that she was M.A.'s mother.  (Compl. ¶ 49.)  And Plaintiffs

specifically allege "J.P. was not accompanied by family members or relatives other than her son and did not tell CBP officers that she was accompanied by anyone other than M.A., despite CBP records to the contrary."   (*Id.*, n.50.)   Defendant asks this Court to dismiss the malicious prosecution claim based on the indictment against J.P., which is based on the same narrative from CBP that Plaintiffs allege was fabricated.  (*See* Mot. at 15, 44.)  Because the parties dispute the facts underlying the probable cause determination, Defendant's motion to dismiss must be denied.

### F.    Plaintiffs State a Claim for False Imprisonment

Defendant argues that Plaintiffs' false imprisonment claim fails because "Defendant had authority under the law to detain them at the border, as Plaintiffs did not have a legal right to enter the United States."  (Mot. at 44.)  But Plaintiffs' claim is based not on the government's initial decision to detain them, nor on M.A.'s transfer to ORR custody, but rather their prolonged detention—at facilities hundreds of miles apart—justified by the wrongful prosecution of J.P. without probable cause.  Plaintiffs allege that Defendant's employees procured the prosecution of J.P. to justify Plaintiffs' prolonged detention and separation, for the purpose of deterring future asylum seekers like J.P. and M.A.  Because Plaintiffs did not consent to their detention for purposes of deterrence, and because J.P.'s criminal prosecution was unsupported by probable cause, Plaintiffs state a claim for false imprisonment under Texas law.

### G.    Plaintiffs State a Claim for Child Abduction

Defendant argues that the tort of child abduction only applies where "a person (usually a relative) violates a prior parental or custody *order* from the court." (Mot. 44-45.)  But the common law cause of action requires merely that the abduction deprive a parent "legally entitled" to her child's custody.  *Silcott*, 721 S.W.2d at 292 (formally adopting Restatement (Second) of Torts, § 700 (1977)); *see Smith v. Smith*, 720 S.W.2d 586, 600 (Tex. Civ. App. 1986) (finding that Tex. Fam. Code § 42.002, which permits suit against an individual who takes possession of a child or conceals the child's whereabouts, does not displace or diminish other available common law causes of action); *Weirich v. Weirich*, 796 S.W.2d 513, 515 n.3 (Tex. Civ. App.-San Antonio 1990), *rev'd on other grounds*, 833 S.W.2d 942 (Tex. 1992) (same).  Unsurprisingly, parents have

lawful custody of their children under Texas law.  *See* Tex. Fam. Code § 151.001(a).  Moreover, numerous courts have relied on *Silcott* to support a cause of action for child abduction in family separation cases.  *E.g.*, *B.Y.C.C.*, 2023 WL 5237147, at *14; *D.A.*, 2023 WL 2619167, at *10 & n.134; *K.O.*, 2023 WL 131411, at *11.

### H.      Plaintiffs State a Claim for Loss of Consortium

Defendant argues that Plaintiffs fail to plead an injury sufficient to support a claim for loss of consortium because Plaintiff J.P.'s alleged physical injuries are not severe enough.  Mot. at 47.  In support, Defendant cites *Reagan*, which held that a child "may recover for loss of consortium when a third party causes serious, permanent, and disabling injuries to their parent."  804 S.W.2d at 467.

Plaintiffs allege that J.P. has "ongoing" foot and vision problems due to the poor conditions in which she was detained (Compl. ¶ 136), which form part of Plaintiffs' negligence claim (*id.* ¶ 146).  Plaintiffs also allege that, while detained, J.P. "severely" injured her spine while she worked to obtain money for the charges the facility imposed to call her son.  (*Id.* ¶¶ 78, 132.)  Defendant's employees exacerbated her injury by forcing her to walk and failing to provide her with adequate medical treatment.  (*Id.* ¶¶ 78-79.)  Based on these "serious" injuries, *Reagan*, 804 S.W.2d at 467, Plaintiffs plausibly allege a loss of consortium claim under Texas law.

### CONCLUSION

For the foregoing reasons, the Court should deny Defendant's motion to dismiss.

Dated:  August 31, 2023                                MORRISON & FOERSTER LLP


_____/s/ Daralyn J. Durie_____

DARALYN J. DURIE
ddurie@mofo.com
MATTHAEUS MARTINO-
WEINHARDT
mmartinoweinhardt@mofo.com
BETHANY D. BENGFORT
bbengfort@mofo.com
HANNA M. LAURITZEN
hlauritzen@mofo.com
425 Market Street,
San Francisco, California  94105
Telephone:    415.268.7000
Facsimile:      415.268.7522


ELLIS LEGAL, P.C.
JOHN C. ELLIS
jellis@ellislegal.com
JUSTIN DELUCA
jdeluca@ellislegal.com
DAVID A. DESCHEPPER
ddeschepper@ellislegal.com
SOPHIA MAIETTA
smaietta@ellislegal.com
200 W. Madison St., Suite 2670
Chicago, IL 60606
Telephone: 312.967.7629

*Pro Bono Counsel for Plaintiffs*